UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

NANCY C. JUSTICE, et al.,
        Plaintiffs,

                              Case No. 2:13-CV-00165
   v.                         JUDGE EDMUND A. SARGUS, JR.
                              Magistrate Judge Terence P. Kemp

OCWEN LOAN SERVICING, LLC,
et al.,
        Defendants.

## OPINION AND ORDER

Plaintiffs Nancy and Ronald Justice bring this suit against Defendants Ocwen Loan Servicing, LLC ("Ocwen") and HSBC Bank USA ("HSBC").[1]  Doc. 3.  This matter is before the Court on Defendants' motion to dismiss.  Doc. 11.  For the reasons stated below, Defendants' motion is **GRANTED in part and DENIED in part** in accordance with this Opinion and Order.

## I. BACKGROUND

### A. Relevant Factual Background

Plaintiffs live in Huntsville, Ohio, in a house they bought in 1996.  Doc. 3 ¶ 27.  They bought the house with a loan secured by the property itself.  *Id.*  Plaintiffs allege that, at some point prior to 2000, they refinanced their original loan.  *Id.* ¶ 29.  According to their complaint, they refinanced the same loan again in April of 2000.  *Id.* ¶ 30.  Instead of keeping a single loan, Plaintiffs secured two loans through National City Bank.  *Id.*

---

[1] As explained within, HSBC serves as the trustee of two Ace Securities Corporation trusts, each of which owns one of the two loans at issue in this case.  Although based on different loans and, to some extent, different facts, Plaintiffs' respective claims against each Ace ownership entity do not require the Court to differentiate between the trusts in order to resolve the instant motion.  Thus, for the sake of efficiency and ease, the Court refers to the ownership trusts collectively as "HSBC."

According to Plaintiffs, the second refinance led to the following two loans on the property: one Plaintiffs refer to as Ocwen Loan Number 33752510 ("First Loan"), and one as Ocwen Loan Number 33752528 ("Second Loan"). *See* doc. 3 ¶¶ 31–33. Plaintiffs also allege that each of the two Loans is owned, respectively, by a securitized trust. As they tell it, "ACE Securities Corp. Home Equity Loan Trust and . . . the Registered Holders of ACE Securities Corp. Home Equity Loan Trust" own the First Loan in trust—through what Plaintiffs call "Series 2005-SN1, Asset Backed Pass-Through Certificates." *Id.* ¶ 1. Plaintiffs refer to this ownership structure as "Defendant SN1." *Id.* ¶ 32. They further allege that "ACE Securities Corp. Home Equity Loan Trust and . . . the Registered Holders of ACE Securities Corp. Home Equity Loan Trust" also own the Second Loan in trust—through what they call "Series 2006-SD1, Asset Backed Pass-Through Certificates." *Id.* ¶ 1. Plaintiffs refer to this ownership structure as "Defendant SD1." *Id.* ¶ 34. Plaintiffs assert that Defendant HSBC serves as the trustee for each of these two securitized trusts. *See id.* ¶ 1. As for Ocwen, Plaintiffs allege that both Loans are currently serviced by the company. They assert that Ocwen acquired servicing rights on the First Loan on November 15, 2004, *id.* ¶ 52; and that, at that time, their account was over two months past due on its payments, *id.* ¶ 53. And they assert that Ocwen acquired the servicing rights for the Second Loan when both it and the First Loan were in default for payment. *See id.* ¶¶ 55–56.

Plaintiffs base their claims on their dealings with Ocwen. They allege that they entered into a loan modification agreement for the First Loan in May of 2008; that they have made every payment according to the terms of the modification agreement through January of 2013; and that Ocwen has improperly reported Plaintiffs to credit agencies as delinquent on both the First and Second Loans. *See id.* ¶¶ 42–47. Plaintiffs further allege that, in November of 2012, they mailed "several letters to Ocwen seeking information regarding the Second Loan, including the

amount necessary to pay off the loan and the name, address, and telephone number of the owner of the Second Loan note and the name of the master servicer of the note." *Id.* ¶ 77. According to Plaintiffs, Ocwen did not respond to their November 2012 letters. *Id.* ¶ 79. They allege the same as to the First Loan, only that they sent inquiries in December of 2012. *See id.* ¶¶ 69–72.

Plaintiffs also allege a series of issues regarding the repayment terms of each of their Loans. With regard to the First Loan, they allege that Ocwen "failed to properly apply [their] payments," *id.* ¶ 90; that Ocwen improperly increased their monthly payments in July of 2011, which contravened the loan modification agreement, *see id.* ¶ 91; that the company has improperly assessed late fees, interest, and additional expenses, *see. id.* ¶¶ 92–96; and that Ocwen has refused to fix these issues with the First Loan, *see id.* ¶ 97. As for their Second Loan, Plaintiffs admit that they had fallen behind on their repayments by October of 2004. Their previous servicer, Altegra, had assessed Plaintiffs a "late charge amount of $565.14, and the principal balance was $7,853.84." *Id.* ¶ 101. Plaintiffs aver that they did not find about the transfer—which they allege happened at some point after the beginning of October of 2004— until December of that year; and that they did so upon receipt of Ocwen's December 2004 statement. *See id.* ¶¶ 101–03. They then paid their previous three past-due payments to prevent further late fees. *Id.* ¶ 104. Plaintiffs also aver that they made, in addition to their late-fee payments, both their December 2004 loan payment and an additional payment for a "valuation expense." *Id.* ¶ 105. Although they continued to make their payments, Plaintiffs allege that Ocwen improperly applied them and improperly charged unauthorized fees. *See id.* ¶¶ 108–12.

Plaintiffs also recount difficulties they had with Ocwen regarding settlement of their Second Loan obligations. According to Plaintiffs, Ocwen made a settlement offer on November 3, 2010—Plaintiffs could completely pay off their loan for $807.11 if they paid by November 29,

2010. *Id.* ¶ 113. Although Plaintiffs attest to sending the payment in time, they allege that Ocwen rejected their check and returned it to Plaintiffs on November 29, 2010. *Id.* ¶ 115. This happened again, according to Plaintiffs, in January of 2011—except this time the payoff amount was $819.63; even though Plaintiffs sent the check for that amount, Ocwen again refused to accept it. *Id.* ¶¶ 116–17. In August of that year, Plaintiffs aver that counsel for Ocwen and SD1 sent a settlement letter with the figure up to $1,827.97; when their son called Ocwen to inquire, he was told the figure was $1,842.00. Plaintiffs' son sent a cashier's check for the amount requested, which Ocwen appeared to accept. *See id.* ¶¶ 118–21. Plaintiffs allege that Ocwen later returned the check and demanded $3,800.00 to pay off the Second Loan. Ocwen made two more settlement offers—one in April of 2012 for $3,698.06, and one in September of 2012 for $3,871.04. *See id.* ¶¶ 122–26. Finally, Ocwen also filed a complaint in foreclosure against them in July of 2012 for "a sum of $739.84 with interest concerning the 2000 loan." *Id.* ¶ 125.

## B. Procedural Background

Based on the above, Plaintiffs filed suit against Ocwen and HSBC in February of 2013. Doc. 1. They allege violations of the Fair Debt Collections Practices Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA"); the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA"); the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*; state contract law; and Ohio's Consumer Sales Practices Act, R.C. 1345.01 *et seq.* ("OCSPA"). Plaintiffs argue that principles of agency law also render SD1 and SN1 (collectively "HSBC") liable in this case. Defendants now move to dismiss Plaintiffs' claims. Doc. 11.

## II. STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of actions that fail to state a claim upon which relief can be granted. Generally, an action will be dismissed pursuant

to Rule 12(b)(6) "if on the face of the complaint there is an insurmountable bar to relief." *Gascho v. Global Fitness Holdings, LLC*, 863 F. Supp. 2d 677, 690 (S.D. Ohio 2012). Insurmountable bars to relief include situations where "there is no law to support the claims made, or if the facts alleged are insufficient to state a claim." *Stew Farm, Ltd. v. Nat. Resource Conservation Serv.*, No. 2:12-CV-0299, 2013 WL 4517825, at *3 (S.D. Ohio Aug. 26, 2013) (citing *Rauch v. Day & Night Mfg. Corp.*, 576 F.2d 697, 702 (6th Cir. 1978)).

As to alleging facts in a sufficient manner, Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *See also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks omitted). To meet this standard, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 570; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (clarifying the plausibility standard articulated in *Twombly*). The Supreme Court has laid out a "two-pronged approach" for determining facial plausibility. *Iqbal*, 556 U.S. at 679. First— "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* Second—focus on the remaining "well-pleaded factual allegations" to "determine whether they plausibly give rise to an entitlement to relief." *Id.*

Several considerations guide whether a complaint meets the facial-plausibility standard. On one hand, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Further, the factual allegations of a pleading "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. On the other hand, a complaint will not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual

enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). When making this determination, a court must construe the claim at issue in the light most favorable to the non-moving party, accept all factual allegations as true, and make reasonable inferences in favor of the non-moving party. *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (citations omitted).

### III. DISCUSSION

Plaintiffs counter Defendants' motion to dismiss on all counts except one. In light of a recent case from the Ohio Supreme Court, Plaintiffs no longer pursue their OCSPA claims. *See Anderson v. Barclay's Capital Real Estate, Inc.*, 136 Ohio St. 3d 31, 37, 989 N.E.2d 997, 1002 (Ohio 2013) (holding that "entities that service residential mortgage loans" are not "suppliers . . . engaged in the business of effecting or soliciting consumer transactions within the meaning of the Ohio Consumer Sales Practices Act" (internal quotation marks omitted)). Defendants' motion to dismiss applies to Plaintiffs' remaining claims. The Court deals with claim each in turn.[2]

#### A. The Fair Debt Collections Practices Act

In Count 1, Plaintiffs claim that Defendants violated the FDCPA. Congress enacted the FDCPA in order to eliminate "the use of abusive, deceptive, and unfair debt collection practices by many debt collectors." 15 U.S.C. § 1692(a). The Sixth Circuit has noted that the FDCPA "is an extraordinarily broad statute" enacted to address what Congress "considered to be a

---

[2] Defendants lead their motion to dismiss with an argument that "[t]he entirety of Plaintiffs' Amended Complaint is reliant on an alleged agency relationship that is not adequately pled." Doc. 11 at 3. They therefore argue that all claims against HSBC reliant upon agency law should be dismissed. *See id.* at 4. Upon review, some of Plaintiffs' claims rely on agency principles, *see, e.g.*, doc. 3 ¶ 66 (arguing that Ocwen's actions also render HSBC liable for any alleged FDCPA violations), and at least one does not, *see, e.g., id.* ¶ 68 (alleging a violation under TILA, which applies only to creditors (like HSBC) and not servicers (like Ocwen), *see Marais v. Chase Home Fin. LLC*, 736 F.3d 711, 714 (6th Cir. 2013)). The Court thus deals with the agency arguments only to the extent Defendants raise them in the context of contesting a specific claim. Otherwise, Defendants fail to develop their agency arguments insofar as they rely solely on their broad introductory point. The Court finds that these arguments are better suited for resolution when developed more fully.

widespread problem." *Frey v. Gangwish*, 970 F.2d 1516, 1521 (6th Cir. 1992). In this case, Plaintiffs allege that Defendants violated 15 U.S.C. § 1692e, § 1692f, and § 1692g of the FDCPA. They allege that Defendants did so by: (1) charging fees, expenses, and interest not authorized in the mortgage or note of the First Loan; (2) misrepresenting the payments required under the loan modification and charging amounts not authorized under the Loan Modification; (3) failing to provide adequate validation of the debt after Plaintiffs requested it; (4) reporting erroneous information about the First Loan and Second Loan to the major credit-reporting agencies; and (5) falsely representing the character or amount of Plaintiffs' Loans. *See* doc. 3 ¶¶ 59–63. Defendants counter with several arguments to support their motion to dismiss.

### 1. "Debt Collectors"

Defendants first point out that the FDCPA applies to "debt collectors," *see* 15 U.S.C. § 1692(e); *id.* § 1692a(6), and argue that Defendants do not qualify as such for purposes of the FDCPA. Under the statute, "debt collector" means "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." *Id.* Ocwen does not contest that it attempted to collect on a debt owed by Plaintiffs; instead, it focuses on the FDCPA's exclusion of certain parties from being qualified as debt collectors. The FDCPA specifically excludes the following from the "debt collector" category: any entity "collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . concerns a debt which was not in default at the time it was obtained by such person." 15 U.S.C. 1692a(6)(F). The issue "depend[s] on whether the debt was assigned for servicing before the default or alleged default occurred." *Bridge v. Ocwen Fed. Bank, FSB*, 681 F.3d 355, 359 (6th Cir. 2012). In other words,

if Ocwen acquired the servicing for the Loans before they were in default, then it is not a debt collector under the FDCPA. But if Ocwen acquired the servicing for the Loans after they were in default, it is a debt collector under the FDCPA.

Ocwen argues that the Loans were not technically in default when acquired.[3] For their part, Plaintiffs allege that their First Loan was two months past due when Ocwen acquired servicing, *see* doc. 3 ¶¶ 52–53; and that they were behind on their Second Loan payments when Ocwen acquired servicing on it, *see id.* ¶¶ 55–56. The FDCPA does not define "default." *See Alibrandi v. Fin. Outsourcing Servs., Inc.*, 333 F.3d 82, 86 (2d Cir. 2003); *Martin v. Select Portfolio Serving Holding Corp.*, No. 1:05-CV-273, 2008 WL 618788, at *5 (S.D. Ohio March 3, 2008). And the Sixth Circuit has not directly spoken to the matter. In light of this, several considerations guide whether a debt owed qualifies as one in default.

To be sure, some of these considerations cut against Plaintiffs' FDCPA claim. Plaintiffs, for example, do not point to any foreclosure proceedings courts view as indicative of default. *See, e.g.*, *Castellanos v. Deutsche Bank*, No. 1:11-CV-815, 2012 WL 2684968, at *8 (S.D. Ohio July 6, 2012). Further, the "in default" inquiry entails "distinguish[ing] between a debt that is in default and a debt that is merely outstanding." *Alibrandi*, 333 F.3d at 86; *see Jones v. Intuition, Inc.*, 12 F. Supp. 2d 775, 779 (W.D. Tenn. 1998) ("Prior to the default period, the unpaid loan installment is considered delinquent."). To this end, an unpaid debt certainly does not qualify as

---

[3] As one of its default arguments, Ocwen contends that Plaintiffs were not "in default" based on Plaintiffs' own complaint. As Ocwen sees it, Plaintiffs themselves allege that they quickly paid off their past-due debt upon Ocwen's acquisition, meaning they admit that the accounts were not in default. The Sixth Circuit addressed this argument in *Bridge* and did not find it compelling:

> We note this argument is exemplary of an unsettling trend in FDCPA claims. Defendants seek to have it both ways: after having engaged in years of collection activity claiming a mortgage is in default, Defendants now seek to defeat the protections of the FDCPA by relying on Plaintiffs' position throughout those years that the mortgage is not in default. As noted in the analysis of the Third Circuit, FDCPA coverage is not defeated by clever arguments for technical loopholes that seek to devour the protections Congress intended.

*Bridge*, 681 F.3d at 361.

one "in default" the second it is past due, *see Alibrandi*, 333 F.3d at 86 ("[O]nly after some period of time does an outstanding debt go into default."); and, according to Plaintiffs, they were only two months overdue on their payments.

On the other hand, the balance of additional relevant factors tips in Plaintiffs' favor. As one, the Sixth Circuit instructs that the FDCPA applies to "any non-originating debt holder that either acquired a debt in default," or to any non-originating debt holder that "*treated the debt as if it were in default* at the time of acquisition." *Bridge*, 681 F.3d at 362 (emphasis added). The complaint alleges that Ocwen acquired servicing when Plaintiffs were at least two months behind on both of the Loans; that Plaintiffs were charged multiple rounds of late fees for their back payments; and that Defendants, at some point thereafter, reported "erroneous information about" the Loans to "the major credit reporting agencies," doc. 3 ¶ 62; assessed "interest, late fees, [and] costs in excess of what was actually owed," *id.* ¶ 95; and, with respect to the First Loan, entered into a modification agreement with Plaintiffs, *see id.* ¶ 42. Viewing the pleadings in a light most favorable to Plaintiffs, they have stated at least a facially plausible claim that Defendants treated the Loans as if they were in default at the time of acquisition.

As another factor, some courts have advocated that the issue of default should be left up to the contractual agreement of the parties. *See Alibrandi*, 333 F.3d at 87 n.5. On this count, Defendants do not point to any company policy, *see Martin*, 2008 WL 618788, at *5 ("SPS considers a loan in default when a payment is 45 days overdue."), nor do they point to a contract between any of the parties that defines "default." Without this, the Court would be left to let Defendants define default according to their own terms. And allowing parties potentially qualifying as debt collectors to unilaterally define "default" as used in the FDCPA would frustrate the intent of the statute. At this stage, the Court finds that Plaintiffs have adequately

alleged that Ocwen is a debt collector that obtained servicing on both Loans at a time when both were in default. Defendants' motion to dismiss is thus denied on this count.

### 2. Sufficiency of the Pleadings

Plaintiffs bring FDCPA claims under 15 U.S.C. §§ 1692e, 1692f, and 1692g. Defendants argue that Plaintiffs fail to state a facially plausible claim under each section.

#### a. 1692e

Section 1692e generally prohibits "false, deceptive, or misleading representation or means in connection with the collection of any debt." And section 1692e(2) specifically prohibits "false representation of . . . the character, amount, or legal status of any debt." 15 U.S.C. § 1692e(2)(A). In adjudicating FDCPA claims, this Circuit follows the objective "least sophisticated consumer" test. *See, e.g., Miller v. Javitch, Block & Rathbone*, 561 F.3d 588, 592 (6th Cir. 2009). That is, "[w]hether a debt collector's actions are false, deceptive, or misleading under [the FDCPA] is based on whether the 'least sophisticated consumer' would be misled by defendant's actions." *Wallace v. Wash. Mut. Bank, F.A.*, 683 F.3d 323, 326 (6th Cir. 2012).

Plaintiffs allege, regarding the First Loan, that they entered into a modification agreement on May 2, 2008, *see* doc. 3 ¶ 42; that they made every payment on that modification, *see id.* ¶ 43; that Ocwen refused to apply their February, 2013 repayment, *see id.* ¶ 44; and that Defendants improperly increased monthly payments on the First Loan "around July [of] 2011 in contravention of the Loan Modification," *id.* ¶ 91. With regard to the Second Loan, Plaintiffs allege that, according to their account statement from December of 2004, they owed $7,606.52 on the principal of the Loan, *id.* ¶ 107; that they then made "18 payments equaling over $3,000" through March of 2006, and that the "principal balance on the Second Loan reflected only $6,663.10," *id.* ¶ 109; that, in their estimation, "Ocwen improperly applied [their] payments

concerning the Second Loan," *id.* ¶ 110; and that Ocwen represented six different settlement amounts for the Second Loan from November 3, 2010 to September 9, 2012, ranging from $807.11 to $3,871.04, *see id.* ¶¶ 113–26. Plaintiffs tie all of this together, averring that their allegations amount to Defendants "falsely represent[ing] the character or amount" of their Loans. Doc. 3 ¶ 63. They also allege that Defendants "negatively report[ed] erroneous information about [both Loans] to the major credit reporting agencies." *Id.* ¶ 62.

Contrary to Defendants' argument, Plaintiffs' pleadings do not allege 1692e violations in cursory and conclusory fashion. Although not all of their allegations fall under "Count One," which is their FDCPA count, Plaintiffs plead factual content that allows the court to draw the reasonable inference that the objective "least sophisticated consumer" would have been misled by Defendants' actions. *See Wallace*, 683 F.3d at 326. Defendants' motion to dismiss on this count is thus denied.

### b. 1692f

Plaintiffs also allege violations of 1692f of the FDCPA. Defendants argue that Plaintiffs have only alleged the bare-bones elements of a claim under section 1692f. Section 1692f generally prohibits the use of "unfair or unconscious means to collect or attempt to collect any debt." It also specifically prohibits, in part, the collection of interest, fees, or other charges not expressly authorized by the loan agreement. *See* 15 U.S.C. 1692f(1). On this count, Plaintiffs allege, as to both Loans, that Defendants charged them unauthorized interest and late fees associated with Defendants' "fail[ure] to properly apply Plaintiffs' payments." Doc. 3 ¶ 90 (regarding the First Loan); *see id.* ¶ 130 (Second Loan).

The Court acknowledges that the issue here is close. On the one hand, Plaintiffs do allege, with specificity, that Defendants have improperly applied their payments and have failed

to keep adequate track of their loan balances.  On the other hand, Plaintiffs also use conclusory language when alleging the additional unauthorized late-fee charges.  Given that the issue is close, and given that this stage requires the Court to read the pleadings in a light most favorable to Plaintiffs, Defendants' motion to dismiss is denied on this count.  The breadth of Plaintiffs' factual allegations, on the whole, states a facially plausible claim for relief under section 1692f. Among other allegations, Plaintiffs advance that Defendants failed to apply payments to their Loan balances; failed to properly keep track of their Loan balances; improperly raised the total balance due on their Second Loan; and, with regard to their First Loan, improperly raised the monthly-payment rates in contravention of the loan modification.  Plaintiffs put forth these allegations with the requisite level of specificity for this stage in the litigation; and they point to the totality of their pleadings to support their claims under section 1692f regarding the improper interest and fee charges.  This is enough to state a facially plausible claim for relief under section 1692f at the motion-to-dismiss stage.

### c. 1692g

Section 1692g has to do with the validation of debts.  It "requires debt collectors to issue a 'validation notice'" informing "the consumer of certain rights" he or she has in verifying or contesting the amount of the debt at issue. *Fed. Home Loan Mortg. Corp. v. Lamar*, 503 F.3d 504, 508 (6th Cir. 2007).  One includes "the right to make a written request for verification of the debt and to dispute the validity of the debt." *Id.*  The debt collector, according to the statute, must issue notice of these rights "within five days after the initial communication with a consumer in connection with the collection of any debt." 15 U.S.C. § 1692g(a).  The notice must also include "a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by

the debt collector." *Id.* § 1692g(a)(3).  Section 1692g, in short, provides consumers a thirty-day window—from the initial validation notice—to verify the amount of their debt.  *See id.*; *see also id.* § 1692(b) ("If the consumer notifies the debt collector in writing within the thirty-day period described in subsection (a) of this section . . . .").

Plaintiffs allege that they sought information regarding their Loans in November and December of 2012.  *See* doc. 3 ¶¶ 69, 76.  Defendants argue that these requests did not come within the initial thirty-day window that the FDCPA provides for consumers to verify their debt. Defendants are correct.  Plaintiffs allege that Ocwen acquired servicing on their Loans in 2004 and that their first communications with Ocwen occurred in 2004.  Assuming the initial notice was valid under section 1692g(a)—Plaintiffs do not argue otherwise—the parties' 2004 communications would have started the thirty-day window.  And because Plaintiffs base their claims under section 1692g on the letters they sent in 2012, they fail to allege that the requests fall within the thirty-day window provided by 1692g.  Thus, Defendants' motion to dismiss is granted to the extent Plaintiffs bring their FDCPA claims based on 1692g.

### 3. FDCPA Statute of Limitations

The FDCPA has one-year statute-of-limitations period.  15 U.S.C. § 1692k(d); *see Ruth v. Unifund CCR Partners*, 604 F.3d 908, 910 (6th Cir. 2010).  Defendants make a cursory statute-of-limitations argument in their reply brief: "Plaintiffs do not assert when Defendants purportedly violated the FDCPA, which prevents this Court and Defendants from ascertaining whether Plaintiffs' claims are viable or barred by the FDCPA's statute of limitations."  Doc. 14 at 6.  The Court declines to grant Defendants' motion as to the FDCPA claims based on this argument.  First, the Court disagrees—as explained, Plaintiffs do allege with clarity when the possible FDCPA violations occurred.  Second, to the extent Defendants attack the FDCPA claim

on statute-of-limitations grounds, they do so in their reply brief. *See In re: Firstenergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 599 (N.D. Ohio 2004) ("It is well-established that a party cannot raise new issues in a reply brief; he can only respond to arguments raised for the first time in opposition." (citing *United States v. Campbell*, 279 F.3d 392, 401 (6th Cir. 2002)). Third, given their potential complexity, any statute-of-limitations issues would be better resolved with more complete arguments at a later stage. *Cf., e.g., Ball v. Ocwen Loan Servicing, LLC*, No. 1:12CV0604, 2012 WL 1745479, at *6 (N.D. Ohio May 16, 2012) (regarding the issue of equitable tolling).

### 4. HSBC's Liability

Defendants finally argue that SN1 and SD1—collectively HSBC—cannot be liable under the FDCPA. They assert specifically that HSBC is a creditor under the Act, meaning the FDCPA does not apply to them. *See Montgomery v. Huntington Bank*, 346 F.3d 693, 698 (6th Cir.2003) (holding that the definition of debt collector "does not include the consumer's creditors"). Although Plaintiffs aver that HSBC "purports to be the owner" of the Loans at issue, doc. 3 ¶¶ 32, 34, they argue that the laws of agency render HSBC liable for Ocwen's conduct. Defendant HSBC has the better of the arguments here.

First, the FDCPA does specifically account for the agency argument. "Debt collector," according to the terms of the statute, includes "any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts." 15 U.S.C. § 1692a(6); *see Bridge*, 681 F.3d at 360. But Plaintiffs fail to allege with any degree of specificity that Ocwen worked as HSBC's direct agent, or as an arm of HSBC, in collecting the Loans at issue. Instead, Plaintiffs' only principal–agent argument contends that HSBC "is liable for all actions undertaken by Ocwen

described hereunder on behalf of the [First and Second Loans], including under the laws of Agency." Doc. 3 ¶¶ 48–49. This amounts to a "naked assertion devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). And this is thus insufficient to state a facially plausible claim that HSBC and Ocwen worked together in a principal–agent relationship to collect the debt at issue.[4]

Second, even if Plaintiffs properly alleged a principal–agent relationship, they would have to allege that HSBC, as a creditor, acquired the Loans when they were in default. *See* 15 U.S.C. § 1692a(6)(F) ("The term [debt collector] does not include . . . any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . (iii) concerns a debt which was not in default at the time it was obtained by such person . . . ."). Plaintiffs do allege, for the purposes of this stage, that Ocwen acquired servicing rights to the loan when the loan was in default. But they make no allegations regarding when HSBC acquired the rights to the Loans; more importantly, they do not allege—even cursorily— that HSBC acquired the rights to the Loans when they were in the default. For these reasons, Defendants' motion to dismiss is granted on this count. To the extent Plaintiffs' FDCPA claims proceed, they proceed against Ocwen and not HSBC.

---

[4] Although a divided Sixth Circuit panel in *Bridge* reached the opposite conclusion when faced with similar facts, the allegations here distinguish this case from *Bridge*. The *Bridge* court held that the two defendants in that case—Deutsche Bank and Ocwen—were debt collectors for the purposes of the FCPA. *See, e.g.*, 681 at 363–64. There the plaintiffs alleged that "Ocwen [was] a division of Deutsche Bank," *id.* at 357, which was sufficient to hook Deutsche Bank for possible liability under the FDCPA. Plaintiffs here do not make a similar allegation; they only allege in cursory fashion that HSBC "is liable for all actions undertaken by Ocwen described hereunder on behalf of the [First and Second Loans], including under the laws of Agency." Doc. 3 ¶¶ 48–49. Further, the *Bridge* court also denied the defendants' motion to dismiss in part because Deutsche Bank argued that it was neither a creditor nor a debt collector for purposes of the FDCPA. *See Bridge*, 681 F.3d at 359 ("Thus, we do not accept Defendants' argument that, even if they are not creditors under the Act, neither are they debt collectors. It would thwart the purpose of the Act to find that a non-originating debt holder is neither a creditor nor a debt collector based on that defendant's adoption of contradictory factual positions. Defendants may not so easily define themselves out of FDCPA coverage."). Defendant HSBC does not take a similar position in this case; it merely argues that it is a creditor, and that Plaintiffs have not sufficiently alleged a principal–agent relationship to make it liable for Ocwen's actions. The Court agrees, and finds the circumstances here distinct enough from those in *Bridge* to lead to a different outcome.

**B. The Truth in Lending Act**

The Truth in Lending Act ("TILA") has several purposes: "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 (1998) (quoting 15 U.S.C. § 1601(a)). The statute thus requires creditors to "provide borrowers with clear and accurate disclosures of terms dealing with things like finance charges, annual percentage rates of interest, and the borrower's rights." *Id.* Given its purpose, the Sixth Circuit has "repeatedly stated that TILA is a remedial statute and, therefore, should be given a broad, liberal construction in favor of the consumer." *Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 163 F.3d 948, 950 (6th Cir. 1998). By its terms, TILA provides for an action for damages against "any creditor who fails to comply with any requirement imposed under" its parts. 15 U.S.C. § 1640(a). Plaintiffs base their TILA claims on two sections, 15 U.S.C. § 1641(f)(2) and 15 U.S.C. § 1639g. The motion for dismiss on these counts breaks down along Defendant-specific lines.

**1. Ocwen's Liability**

Defendants argue that TILA provides a cause of action against a creditor for the failure of mortgage servicers, but not against the actual servicer itself—unless the plaintiff alleges the servicer to be a creditor or assignee of the original loan. This, in their estimation, means that Plaintiffs' TILA claims against Ocwen must fail. Plaintiffs disagree. After Defendants moved to dismiss the claims in this case, the Sixth Circuit directly addressed this exact issue. The plaintiffs in *Marais v. Chase Home Fin. LLC*, 736 F.3d 711, 716 (6th Cir. 2013), argued that "Congress created a private cause of action for violation" of sections "(f) or (g) of § 1641"; and

that "because only servicers can violate § 1641(f), Congress must have intended to create a cause of action against servicers for failure to comply with § 1641(f)(2), notwithstanding that the introductory language of § 1640 refers only to creditors." The Sixth Circuit disagreed. In doing so, it held that "mere servicer[s] . . . cannot be liable for violating 15 U.S.C. § 1641(f)(2)." *Id.* at 719. Instead, "TILA expressly exempts servicers from liability unless the servicer was also a creditor or a creditor's assignee." *Id.*; *see* 15 U.S.C. § 1641(f)(1) ("In general . . . [a] servicer of a consumer obligation arising from a consumer credit transaction shall not be treated as an assignee of such obligation for purposes of this section *unless the servicer is or was the owner of the obligation*." (emphasis added)). Applied here, Plaintiffs advance their TILA claims against Ocwen solely on the basis of Ocwen's status as a servicer. This is the same argument that the Sixth Circuit rejected as to another servicer in *Marais*. Plaintiffs' TILA claims against Ocwen are thus dismissed.

### 2. HSBC's Liability

Setting Ocwen aside, the remainder of Plaintiff's TILA claims proceed against HSBC. Defendants contest Plaintiffs' claim under 15 U.S.C. § 1641(f)(2) as it applies to the First Loan, and under 15 U.S.C. § 1639g as it applies to the Second Loan. The Court deals with each in turn.

Regarding the First Loan, Plaintiffs assert in Count 2 that they mailed several letters to Ocwen seeking the name, address, and telephone number of the owner of the Loan; and that Ocwen did not respond to their letters in violation of 15 U.S.C. § 1641(f)(2). HSBC counters by arguing that section 1641(f)(2) requires the servicer to provide information regarding "the owner of the obligation *or* the master servicer of the obligation," 15 U.S.C. § 1641(f)(2) (emphasis added); and that because Plaintiffs only allege that Ocwen failed to provide the owner's

17

information, rather than *both* the owner's and the master servicer's information, Plaintiffs have failed to state a claim against HSBC on this count. The Court disagrees.

First, HSBC's argument defies the plain meaning of the statute's language. The statute, by its own terms, places the obligation on the servicer to provide the consumer with information of either the master servicer or the owner—not both. Further, read in context, the servicer must do so "[u]pon written request by the obligor." In other words, the servicer must do so based on the nature of the obligor's request—not based on whatever piece of information the servicer itself wants to send.

Second, reading the statute the way HSBC proposes contravenes the purpose of the statute. Again, TILA is a remedial statute to be construed broadly in the consumer's favor. *Begala*, 163 F.3d at 950. In accordance with the statute, Plaintiffs asked for the information of the owner of the First Loan; and they allege that Ocwen failed to send that information. HSBC cannot evade liability because Plaintiffs did not ask for *both* the master servicer's and the owner's information. In short, the Court denies HSBC's motion to dismiss as to the First Loan based on this argument.

As to the Second Loan, Plaintiffs allege in Count 3 that they "mailed several letters to Ocwen seeking . . . the amount necessary to pay off the loan and the name, address, and telephone number of the owner of the Second Loan note and the name of the master servicer of the note," doc. 3 ¶ 76; and that Ocwen failed to respond in violation of 15 U.S.C. § 1641(f)(2) and 15 U.S.C § 1639g. HSBC challenges Plaintiffs' Count 3 claim according to 15 U.S.C § 1639g. Section 1639g provides that "[a] creditor or servicer of a home loan shall send an accurate payoff balance within a reasonable time, but in no case more than 7 business days, after the receipt of a written request for such balance from or on behalf of the borrower." According

18

to HSBC, this section of TILA does not provide a private right of action for damages. Whether or not section 1639g provides a private right of action is an issue that, so far as the Court can tell, has not been squarely addressed by a federal court.

Just because "a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 (1979). Statutory construction dictates whether a private right of action exists—that is, whether a plaintiff can sue a private party and recover for the violation of a federal law. *See Cannon v. Univ. of Chi.*, 441 U.S. 677, 688 (1979). On this count, "it is settled that there is an implied cause of action only if the underlying statute can be interpreted to disclose the intent to create one." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 164 (2008). In *Cort v. Ash*, 422 U.S. 66 (1975), the Supreme Court laid out the overarching factors that determine whether a statute conveys this sort of intent:

> First, is the plaintiff one of the class for whose especial benefit the statute was enacted—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

422 U.S. at 78 (citations omitted) (internal quotation marks omitted). In working through these factors, the Supreme Court has moved to placing particular importance on "Congress's intent with the text and structure" of the statute at issue as to whether it creates a private right of action. *Alexander v. Sandoval*, 532 U.S. 275, 288 (2001).

As a broad matter, TILA statutes pass through the four factors above. Section 1640 of TILA contains the sort of "rights-creating language so critical to the" right-of-action analysis, *Sandoval*, 532 U.S. at 288:

> Except as otherwise provided in this section, *any creditor who fails to comply with any requirement imposed under this part*, including any requirement under section 1635 of this title, subsection (f) or (g) of section 1641 of this title, or part D or E of this subchapter with respect to any person *is liable to such person* . . . .

15 U.S.C. § 1640(a) (emphasis added); *see Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 597 n.15 (2010) (explicitly citing TILA, and then noting "[t]he dissent's concern . . . with Congress' policy choice, embodied in statutory text, to authorize private rights of action and recovery of attorney's fees, costs, and in some cases, both actual and statutory damages"); *Stephens v. Bank of Am., Corp.*, No. 1:12-CV-53, 2012 WL 4359436, at *4 n.4 (E.D. Tenn. Sept. 21, 2012) ("15 U.S.C. § 1640 provides a private right of action and damages under the Truth in Lending Act (TILA)."); *Cavette v. Mastercard Intern., Inc.*, 282 F. Supp. 2d 813, 817 (W.D. Tenn. 2003) ("TILA expressly provides a private right of action . . . .").

Whether there is a private right of action for section 1692g follows the same logic. Section 1692g is not an original TILA provision, rather an amendment to TILA added by the Dodd–Frank Act. *See* Truth in Lending Act (Regulation Z), 77 Fed. Reg. 55,278 (Sept. 7, 2012). Still, the language of TILA's private-right-of-action provision is broad: "any creditor who *fails to comply with any requirement* imposed under this part . . . with respect *to any person* is liable to such person . . . ." 15 U.S.C. 1640(a) (emphasis added). The statute further demonstrates an intent not only to create a private right, "but also a private remedy." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002); *see* 15 U.S.C. 1640(a)(1)–(2) (describing the amount of available damages). It is true that section 1640(a) notes that the private right and remedy exist "[e]xcept as otherwise provided." This language does not displace section 1460(a). Based on the factors laid out and on section 1640's own terms, the Court finds that section 1639g does provide Plaintiffs

with a private right of action.  Thus, HSBC's motion to dismiss as to Plaintiffs' claim under this section is denied.

## C. The Real Estate Settlement Procedures Act

Plaintiffs also bring a claim under RESPA.  Congress enacted RESPA "in part to provide more effective advance disclosure to home buyers and sellers of settlement costs, and in response to abusive practices in the real estate settlement process." *Mellentine v. Ameriquest Mortg. Co.*, 515 F. App'x 419, 424 (6th Cir. 2013) (internal quotation marks omitted).  According to the statute, a consumer can send a servicer of a loan a qualified written request ("QWR").  A proper QWR "includes, or otherwise enables the servicer to identify, the name and account of the borrower," as well as the borrower's reasoning, "to the extent applicable," for its belief that "the account is in error."  12 U.S.C. § 2605(e)(1)(B)(i)–(ii); *see also id.* § 2605(e)(1)(B)(ii) (noting that a QWR may also include "sufficient detail to the servicer regarding other information sought by the borrower").  Receipt of a proper QWR triggers several servicer duties, including (a) providing, within five days, a written response acknowledging receipt of the QWR, *see id.* § 2605(e)(1)(A); and, within thirty days, (b) either making appropriate corrections to the borrower's account and letting the borrower know of the corrections, *see id.* § 2605(e)(2)(A), or conducting an investigation into the borrower's inquiries and letting the borrower know why the servicer believes the account is accurate, or why the servicer cannot help the borrower, *see id.* § 2605(e)(2)(B)–(C).

Defendants argue that Plaintiffs' RESPA claim "consists solely of legal conclusions," and that it specifically fails to allege that the QWR contained an adequate statement of their account's errors.  The Court disagrees.  Plaintiffs alleged that they submitted at least two QWRs to Ocwen—on December 12, 2012 (for the First Loan), doc. 3 ¶ 69, and on November 20, 2012

(for the Second Loan), *id.* ¶ 76; they alleged that the requests asked for the amount necessary to pay off the Loans, as well as information regarding the owner of the Loans, *see id.* ¶¶ 69, 76; and they allege that Ocwen failed to respond with a letter acknowledging receipt of their requests, and that Ocwen failed to respond to the substance of their requests, *see id.* ¶ 84. These pleadings allege the elements of a violation of 12 U.S.C. § 2605(e), and thus allege enough for a RESPA claim at the motion-to-dismiss stage. *See Mellentine*, 515 F. App'x at 424–25. Further, Defendants' argument regarding the sufficiency of Plaintiffs' QWR does not convince the Court otherwise. According to its own terms, RESPA does not state that a QWR must contain a precise statement of their account's errors. To be sure, a sufficient QWR can include this information; "or" it can "provide[] sufficient detail to the servicer regarding other information sought by the borrower." 12 U.S.C. § 2605(e)(1)(B)(ii). According to their allegations, Plaintiffs' QWRs asked either for information regarding the owner of the Loans, the payoff amount, or both. They thus contained sufficient detail about the nature of their requests, and Defendants' motion to dismiss on this count is denied.

**D. Breach of Contract**

Finally, Plaintiffs bring two claims for breach of contract, one for each Loan. A claim for breach of contract under Ohio law contains the following elements: "that (1) a contract existed, (2) the plaintiff fulfilled his obligations, (3) the defendant failed to fulfill his obligations, and (4) damages resulted from this failure." *Anzalaco v. Graber*, 970 N.E.2d 1143, 1148 (Ohio Ct. App. 2012). Defendants argue that Plaintiffs have failed to allege sufficient facts to demonstrate the existence of a contract, and have failed to allege that Plaintiffs or Defendants were parties to the mortgage or loan modification contracts.

Plaintiffs counter by pointing back to their complaint. In it, Plaintiffs allege that they own a piece of property through which they secured two mortgages—the First Loan and the Second Loan, *see* doc. 3 ¶¶ 27–34; and that Defendants SN1 (First Loan) and SD1 (Second Loan)—collectively HSBC—are the respective owners of the mortgages, *see id.* ¶¶ 31–34. With regard to the First Loan, Plaintiffs also allege the following: Plaintiffs and Ocwen, on behalf of HSBC, entered into a loan modification agreement, *see id.* ¶ 42; and that, despite Plaintiffs making all payments of an agreed-upon monthly amount ($1,381.05, *id.*) in a timely manner, Defendants refused Plaintiffs' February 2013 payment, changed the amount of money due under the modification, improperly increased the monthly payment amount due, wrongfully reported Plaintiffs to credit-rating agencies, and informed Plaintiffs of imminent foreclosure, *see, e.g., id.* ¶¶ 42–45, 88–96. With regard to the Second Loan, Plaintiffs provide details regarding the extent of Defendants' alleged misapplication of their loan payments, *see, e.g., id.* ¶¶ 105–12; and details of Ocwen allegedly reneging on three different settlement agreements regarding the Second Loan, *see, e.g., id.* ¶¶ 113–26. Finally, Plaintiffs allege that these dealings have led to unauthorized additional interest, late fees, and costs. *See id.* ¶ 133.

Contrary to Defendants' arguments, these pleadings adequately allege claims for breach of contract. Based on the above, they allege the existence of contracts (the Loans and the First Loan modification), and that Plaintiffs and Defendants were parties to or parties in interest to those contracts. *See Shealy v. Campbell*, 20 Ohio St. 3d 23, 24, 485 N.E.2d 701, 702 (Ohio 1985) ("A real party in interest has been defined as . . . one who has a real interest in the subject matter of the litigation, and not merely an interest in the action itself, *i.e.*, one who is directly benefitted or injured by the outcome of the case." (internal quotation marks omitted)). Plaintiffs allege that they fulfilled their duties by making all necessary payments on those contracts; that

Defendants did not fulfill theirs when they refused to accept their payments according to the terms of the contracts, and when they unilaterally changed the terms of the contracts; and that this caused Plaintiffs damages. And Plaintiffs allege as much in a manner sufficient for this stage of pleadings, without the benefit of discovery. In short, Plaintiffs plead their claims for breach of contract with enough detail to survive Defendants' motion to dismiss, and Defendants' motion to dismiss is thus denied on this count.[5]

## IV. CONCLUSION

For the reasons stated, Defendants' motion to dismiss, doc. 11, is **GRANTED in part and DENIED in part**. Specifically, the motion is:

- **GRANTED** as to Plaintiffs' OCSPA claims;

- **GRANTED** as to Plaintiffs' FDCPA claims against Defendant HSBC; **GRANTED** as to Plaintiffs' FDCPA claim under 15 U.S.C. § 1692g; and **DENIED** as to the FDCPA claims against Defendant Ocwen under 15 U.S.C. § 1692e, and 15 U.S.C. § 1692f;

- **GRANTED** as to Plaintiffs' TILA claims against Ocwen; and **DENIED** as to the TILA claims against Defendant HSBC;

- **DENIED** as to Plaintiffs' claims under RESPA; and

- **DENIED** as to Plaintiffs' claims for breach of contract.

**IT IS SO ORDERED.**


2 - 7 - 2014
_____
**DATED**

_____
**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**

---

[5] Defendants also argue, in a footnote of their reply brief, that "Plaintiffs' breach of contract claims are undone by their own allegations that they were in default of the mortgage." Doc. 14 at 9. Defendants fail to develop this argument, and the Court further declines to address an argument raised for the first time in the reply. *See In re: Firstenergy Corp. Sec. Litig.*, 316 F. Supp. 2d at 599.