UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

NANCY C. JUSTICE, et al.

    Plaintiffs,

    v.

OCWEN LOAN SERVICING, et al.

    Defendants.

Case No. 2:13-CV-165
JUDGE EDMUND A. SARGUS, JR.

## OPINION AND ORDER

Plaintiffs Nancy and Ronald Justice bring this suit against Defendants Ocwen Loan Servicing, LLC ("Ocwen") and HSBC Bank USA ("HSBC").[1] This matter is before the Court on Plaintiffs' and Defendants' Motions for Summary Judgment (ECF Nos. 34 & 36). For the reasons that follow, Plaintiffs' Motion (ECF No. 36) is **GRANTED IN PART and DENIED IN PART** and Defendants' Motion (ECF No. 34) is **GRANTED IN PART AND DENIED IN PART.**

### I. BACKGROUND

The Justices purchased their house in Huntsville, Ohio in 1974 and refinanced their home in April 2000 by obtaining two loans from National City Bank. (Nancy Aff. ¶ 2; ECF No. 36-1.) A mortgage secured each note. Because the Justices' claims stem from these two loans, the Court describes each loan in turn.

---

[1] HSBC serves as the trustee of two Ace Securities Corporation trusts, each of which owns one of the two loans at issue in this case. Although based on different loans and, to some extent, different facts, the Justices' respective claims against each Ace ownership entity do not require the Court to differentiate between the trusts in order to resolve the instant motion. Thus, for the sake of efficiency and ease, the Court refers to the ownership trusts collectively as "HSBC."

### A. First Loan

The Justices executed a $127,112.50 note on April 19, 2000 ("First Loan"), and a mortgage ("First Mortgage") on their home. (First Note; ECF No. 34-3; First Mortg.; ECF No. 34-4.) The First Mortgage was assigned to ACE Securities Corp. Home Equity Loan Trust and the Registered Holders of Ace Securities Corp. Home Equity Loan Trust, Series 2005-SN1, Asset Backed Pass-Through Certificates. This trust also holds the First Loan. (Lucas Aff. ¶ 9; ECF No. 34-2.)

The First Loan charged an 11% interest rate on all outstanding principal due. (First Note ¶ 3.) The note further stated that "Interest will be computed on a simple interest basis . . . Accordingly, your payment history could affect the amount you pay under this Note." (First Note ¶ 3.)

Ocwen began servicing the First Loan on November 15, 2004. (Lucas Aff. ¶ 12.) At that time, the Justices had missed their past three payments. (Lucas Aff. ¶¶ 14-15.) Within a month, however, the Justices made these payments. (Lucas Aff. ¶ 15; Nancy Aff. ¶ 4.) But soon thereafter, the Justices once more struggled to make payments, as their monthly payments were consistently delinquent between 2005 and May 2008. (Lucas Aff. ¶ 16.)

In May 2008, Ocwen and the Justices agreed to a loan modification that brought the First Loan current and modified the unpaid principal balance ("Loan Modification"). This contract required that the Justices "make an initial down payment in the amount of $1,545.61 on or before May 15, 2008, after which" the Justices would "commence payments of principal and interest in the amount of $1,381.04 on June 5, 2008 and continuing on the 5th day of each succeeding month until all amounts owed under the Note and Modification are paid in full." (Loan Mod. ¶ 2; ECF No. 34-7.) The Loan Modification also adjusted the interest rate. Specifically, it stated,

Upon Modification, the annual rate of interest charged on the unpaid principal balance of your loan will be reduced to 3.95%. This rate will remain in effect until the end of a 3 year period beginning with [the Justices'] first payment after the down payment. At the end of this period, [the Justices'] interest rate will be calculated according to the terms of [their] original loan documentation.

(Loan Mod. ¶ 4.) The Justices made the initial payment of $1,545.61 and then continued to make monthly payments of $1,381.05.[2] (Nancy Aff. ¶¶ 6-7.)

A dispute arose approximately three years after the parties entered the Loan Modification. In November 2011, Ocwen sent a statement claiming that the Justices' owed $1,742.11 monthly. According to Ocwen, the increase in the Justices' interest rate after three years raised their monthly amount due to $1,742.11.[3] (ECF No. 36-10; *see also* Lucas Aff. ¶ 21.) The Justices, however, believed that the Loan Modification permanently reduced their monthly amount due and so they continued to pay the lower amount. (Nancy Aff. ¶¶ 10-11.) Ocwen began to assess late charges and interest on the loan. (Lucas Aff. ¶ 22.) Finally, in February 2013, Ocwen refused to accept the Justices' lesser payments as insufficient. (Ltr.; ECF No. 36-13.)

During this time, the parties never came to an agreement as to the monthly amount owed. In December 2011, the Justices faxed Ocwen proof of payment for a previous month's statement in the amount of 1,540.75. (Fax; ECF No. 34-8.) Ocwen responded, telling the Justices that the interest rate increased on June 5, 2011 under the Loan Modification and thus they were not submitting enough to make their required payment as they now owed $1,742.11 per month. (Resp. Ltr. ECF No. 34-9.)

---

[2] The Justices also had to make payments of taxes and insurance, which fluctuated. At the end of the three year period, this totaled an additional $159.71 per month, for a total monthly payment of $1,540.75. (Lucas Aff. ¶ 20.)

[3] Interestingly, the Justices submit their monthly statements showing that Ocwen did not begin charging the Justices the $1,742.11 amount until November 2011, several months after the three year period ended. According to these statements, Ocwen continued to charge $1,540.75 through October 2011. These statements included an interest rate of 11%. (ECF No. 36-10.)

A month later, in January 2012, the Ohio Attorney General sent Ocwen a letter on the Justices' behalf requesting information on the First and Second Loan. (Lucas Aff. ¶ 26.) Ocwen responded in February 2012, providing information including that it serviced the loan on behalf of the registered holders of the trust, when Ocwen obtained servicing rights, an explanation that the First Loan is a simple interest loan and how interest is applied, and a copy of the transaction history. (Ltr. AG; ECF No. 34-10.) Ocwen received no further contact from the Ohio Attorney General and there was no further investigation into the matter. (Lucas Aff. ¶ 28.)

Then, in December 2012, the Justices sent Ocwen a letter labeled "RESPA DEMAND," disputing the late charges and fees, requesting information regarding their account, such as when servicing transferred to Ocwen and what the current interest rate was, and requested the name, address, and phone number of the owner of the note. (Ltr; ECF No. 36-11.) Ocwen responded later that month, providing information such as when Ocwen began servicing the First Loan, the current interest rate, a transaction history, a payoff quote, and a reinstatement quote under separate cover.[4]  (Resp. Ltr.; ECF No. 34-12.)

### B. Second Loan

On April 19, 2000, the Justices executed a second note in the amount of $10,014.00 ("Second Loan"). (Second Note; ECF No. 34-13.)  As security, they executed a mortgage on the same property as the First Loan ("Second Mortgage").  The holder of the Second Loan and the assignee of the Second Mortgage is ACE Securities Corp. Home Equity Loan Trust and the Registered Holders of Ace Securities Corp. Home Equity Loan Trust, Series 2006-SD1, Asset Backed Pass-Through Certificates. (Second Mortg.; ECF No. 34-14; Lucas Aff. ¶ 36.)  Like the

---

[4] Ocwen does not provide for the record the materials offered under separate cover, but the Justices do not deny receiving them.

4

First Loan, the Second Loan computes interest on a simple interest basis.  (Second Note ¶¶ 3, 7; ECF No. 34-13.)

Ocwen began servicing this loan on November 15, 2004.  (Lucas Aff. ¶ 37.)  At that time, the Justices had not made their September, October, or November payments for that year.  (Lucas Aff. ¶¶ 38-39.)   The Justices subsequently made these payments in December 2004.  (Lucas Aff. ¶ 40; Account Stmt.; ECF No. 36-15.)

The Justices maintain that after December 2004, they continued to make their monthly mortgage payments believing the loan was current.  (Nancy Aff. ¶ 19.)  In May 2005, however, Ocwen responded to correspondence sent by the Justices expressing concern over the total amount due.  Ocwen explained that the Second Loan was a simple interest loan and explained the implications of making late payments.  (Ltr.; ECF No. 34-6.)  In May 2009, Ocwen sent the Justices a letter reminding them that the Second Loan matured on May 5, 2010, that the remaining balance would be due to be paid in full, and that their current contractual payment amount would not be sufficient to satisfy the requirements by that time.  (Ltr.; ECF No. 34-17.)

The loan matured on May 5, 2010 and the Justices' payments did not satisfy the amount owed, and so interest and late fees accrued.  (Lucas Aff. ¶¶ 42-43.)  The Justices wrote Ocwen disputing the fees on the account and Ocwen responded, explaining the fees charged on the account and the basis for said fees.  (Resp. Ltr.; ECF No. 34-18.)  Around this time, Ocwen made three separate discounted payoff offers to the Justices, but none were accepted.  (Lucas Aff. ¶¶ 45-50.)

In August 2011, the Justices state that Ocwen's counsel sent a letter to them informing them that the outstanding amount on the Second Loan was $1,827.97.  (Nancy Aff. ¶ 24.)   That

month, the Justices' son Ron called Ocwen requesting a payoff quote.  (Lucas Aff. ¶ 51; Ron Aff. ¶ 4; ECF No. 36-27.)

What happened next depends on who tells the story.  Ocwen maintains that it informed Ron that no settlement options were available.  (Lucas Aff. ¶ 51.)  The Justices assert that Ron reached an agreement with Ocwen that $1,842.97, in the form of a certified check sent via next day delivery, would satisfy the debt.  (Ron Aff. ¶ 4; ECF No. 36-27.)

Both parties agree that Ron tendered a $1,842.97 check to Ocwen.  But Ocwen refused to accept it and returned the check in September 2011.  (Sept. 30 Ltr.; ECF No. 36-21.)  That month, Ocwen made another payoff quote, this time in the amount of $2,942.05, but the Justices never tendered the payoff funds.  (Lucas Aff. ¶¶ 54-55.)

On February 8, 2012, when Ocwen responded to the Ohio Attorney General's inquiry, it also offered information on the Second Loan.  For example, it provided that it serviced the loan on behalf of the trust, that the Justices had a simple a simple interest loan, when servicing transferred to Ocwen, transaction history, and information regarding payoff negotiations.  (Lucas Aff. ¶ 27; AG Ltr. ECF No. 34-10.)  After this correspondence, Ocwen received no further contact from the Ohio Attorney General.  (Lucas Aff. ¶ 28.)

In April 2012, Ocwen sent another payoff quote.  This time, the requested amount was $3,698.06.  (Ltr.; ECF No. 34-21.)  The Justices did not tender this amount, and in July 2012, HSBC filed a foreclosure action in state court.  HSBC then voluntarily dismissed the suit in September 2012.   (Payoff Ltr.; ECF No. 36-22; ECF Nos. 36-23 & 36-24.)

In November 2012, the Justices sent Ocwen a letter labeled "RESPA DEMAND" requesting, among other things, the amount necessary to reinstate the loan and the name, address, and phone number of the owner of the Second Loan and the name of the master servicer.  (Nov.

Ltr. at 1, 7; ECF No. 36-25.) Though Ocwen asserts that it has no record of receiving the letter, a certified mail receipt shows that the loan servicer received the correspondence on November 26, 2012. (Nov. Ltr. at 10; ECF No. 36-25.) Ocwen never responded to this letter.

Based on the above, the Justices filed suit against Ocwen and HSBC in February of 2013. The parties have now filed cross motions for summary judgment on the Justices' allegations regarding violations of state contract law; the Fair Debt Collections Practice Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA"); the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA"); and the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.* The Court addresses each claim in turn.

## II. STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence). Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita*, 475 U.S. at 587–88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

Here, the parties have filed cross-motions for summary judgment. Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that he or it is entitled to a judgment as a matter of law. The fact that one party fails to satisfy that burden on his or its own Rule 56 motion does not automatically indicate that the opposing party or parties has satisfied the burden and should be granted summary judgment on the other motion. In reviewing cross-motions for summary judgment, courts should "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994). "The filing of cross-motions for summary judgment does not necessarily mean that the parties consent to resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated record." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (quoting *John v. State of La. (Bd. of Trs. for State Colls. & Univs.)*, 757 F.2d 698, 705 (5th Cir.1985)). The standard of review for cross-motions for

summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation. *Taft Broad.*, 929 F.2d at 248.

### III. ANALYSIS

### A. Breach of Contract

The Justices assert that Ocwen and HSBC breached a contract on each loan. As the party alleging a breach of contract, the Justices bear the burden to prove: "(1) the existence of a binding contract; (2) that the nonbreaching party performed its contractual obligations; (3) the other party failed to fulfill its contractual obligations without legal excuse; and (4) the nonbreaching party suffered damages as a result of the breach." *Nachar v. PNC Bank, Nat. Ass'n*, 901 F. Supp. 2d 1012, 1018 (N.D. Ohio 2012) (citation omitted) (outlining Ohio law). Ocwen and HSBC maintain that there is no genuine dispute that they did not breach the subject contracts, and it was the Justices who failed to perform their end of the bargains. The Justices maintain that the facts unequivocally show that they performed on both loans, while Ocwen and HSBC failed to satisfy their obligations.

#### 1. First Loan

As to the first loan, the Justices argue that Ocwen and HSBC breached the Loan Modification by improperly increasing their monthly amount due around July 2011. The defendants, meanwhile, assert that the Loan Modification increased the Justices' monthly obligations at the end of the three year period because their interest rate increased.

"The cardinal purpose for judicial examination of any written instrument is to ascertain and give effect to the intent of the parties." *Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997). That intent "is presumed to reside in the language they chose to employ in the agreement." *Id.* The Court will read the

contract as a whole, and common words are to be given their ordinary meaning "unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Id.* "A contract is to be construed against the party who drew it." *Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Ohio 1996).

The Justices argue that the Loan Modification required them to pay only $1,381.04 a month—even beyond the three-year period that reduced their interest rate—until they paid off all amounts owed under the First Loan. They point to a paragraph in the Loan Modification that states:

> "[The Justices] promise to make an initial down payment in the amount of $1,545.61 on or before May 15, 2008, after which [the Justices] will commence payments of principal and interest in the amount of $1,381.04 on June 5, 2008 and continuing on the 5th day of each succeeding month until all amounts owed under the Note and Modification are paid in full."

(Loan Mod. ¶ 2; ECF No. 34-7.) The Justices assert that this language reflects an intent by the parties to extend the period of repayment, "accumulating interest in the background so that" they could continue to pay the reduced amount until the loan was "paid in full." (Resp. at 17; ECF No. 36.) The Justices timely paid this reduced amount, and so they argue that they performed their obligation, while Ocwen impermissibly increased their monthly payment of principal and interest, thus breaching the Loan Modification. (Nancy Aff. ¶¶ 6-7, 11.)

The Court holds that the Loan Modification required the Justices to make only the reduced payments and that the increase in the interest rate did not increase the amount due. The Loan Modification states that the Justices "promise to make . . . *payments of* principal *and interest* in the amount of $1,381.04 . . . each . . . month." (Loan Mod. ¶ 2; ECF No. 34-7 (emphasis added).) Thus, the contract's plain terms indicate that the $1,381.04 encompasses any interest payment the Justices owe. And though Ocwen maintains that the Loan Modification did

not alter the maturity date, the contract provides for the reduced payments to "continu[e] . . . *until* all amounts owed . . . are paid in full." (Loan Mod. ¶ 2 (emphasis added).)  Thus, the Justices' obligations under the contract are to continue making the reduced payments until they have paid all amounts owed.

Ocwen and HSBC press that the Loan Modification increases the monthly amount due after three years because the interest rate increased from 3.95% to 11%, and "[i]t is axiomatic that if the interest rate increases, so too will the total monthly payment." (Reply at 3; ECF No. 39.)  But the Loan Modification remains silent as to how the parties will treat this increased interest rate and it does not expressly state the Justices' *payments* would increase.

According to the defendants, keeping payments at $1,381.04 while increasing the interest rate would cause the Justices to get further behind on the loan, and that "[i]n theory," they could have to pay in perpetuity. (Reply at 4; ECF No. 39.)  But the defendants point to no evidence showing that this scenario *in fact* results from such interpretation.  Under the contract, the Justices pay a steady $1,381.04, but the ratio of principal-to-interest within that amount changes after three years such that more of the payment is applied to interest and less to principal. (*See* Statements at 3-8; ECF No. 36-10 (reflecting the reduced payment amount with an 11% interest rate)).

Thus, the Court finds that the Justices performed under the Loan Modification by continuing to make reduced payments after the interest rate increased. (Nancy Justice Aff. ¶¶ 6-7, 11.)  And Ocwen and HSBC breached the contract by improperly increasing the amount due, causing the Justices to sustain damages in the form of additional charges. (Lucas Aff. ¶¶ 21-22 (explaining that the First Loan accrued interest and incurred late charges after Ocwen increased

the Justices' monthly amount due.)  Because the Justices move for summary judgment as to liability only, the extent of these damages will be determined at trial.

### 2. Second Loan

Next, the Justices maintain that Ocwen breached a contract concerning the Second Loan by returning a purported payoff amount that the parties allegedly agreed to, and then continuing to assess interest and charges to their account.  The Justices assert that they sent Ocwen a check for $1,842.97 after their son, Ron Justice, reached an agreement with the loan servicer to satisfy the Second Loan for that amount.  (Ron Aff. ¶¶ 4-5; ECF No. 36-27.)  Ocwen, however, returned the check as insufficient to satisfy the Second Loan and denies making any such settlement agreement.

Whether a payoff agreement was made is an issue of genuine fact here.  Ocwen denies making such an offer, and presents evidence that when the Justices' son called, he was advised no options were available.  (Lucas Aff. ¶ 51.)  And the Justices offer their son's affidavit, in which he states that after contacting Ocwen's Home Retention Department, "Ocwen told [him] it would completely satisfy the Second Loan in exchange for payment of $1,842.97" and that the company instructed him to send the funds as a certified check via next day delivery.  (Ron Aff. ¶ 4; ECF No. 36-27.)

Ocwen and HSBC argue that Ron's affidavit is inadmissible for two reasons.  Both miss the mark.  First, they argue it contains out-of-court statements to prove the truth of the matter asserted and thus constitutes inadmissible hearsay.  *See* Fed. R. Evid. 801.  But Rule 801(d)(2)(D) excludes from hearsay those statements "offered against an opposing party . . . made by the party's agent or employee on a matter within the scope of that relationship while it exists."  All indicators point to Ron speaking with an employee who acted within his or her

scope of employment and thus the Court finds the evidence admissible.  *See Simns v. Maxim Healthcare Servs., Inc.*, No. 11-1052, 2013 WL 435293, at *10 (W.D. Tenn. Feb. 4, 2013) ("The alleged statement from in-house corporate counsel concerning legal advice relative to employee retention issues plainly concerned a matter within the scope of its purpose and is, therefore, admissible.").

Second, Ocwen and HSBC argue that Federal Rule of Evidence 408 bars this testimony because Ron's affidavit attests to conversations regarding negotiations and offers of settlement in an attempt to prove the validity of the amount offered.  But it is well established that Rule 408 does not exclude evidence relating to a settlement when offered for the purposes of interpreting and enforcing the settlement.  *See* Advisory Committee Notes accompanying 2006 amendments to Evidence Rule 408 (citing *Cates v. Morgan Portable Bldg. Corp.*, 780 F.2d 683, 691 (7th Cir. 1985) (Rule 408 does not bar evidence of a settlement when offered to prove a breach of the settlement agreement, as the purpose of the evidence is to prove the fact of settlement as opposed to the validity or amount of the underlying claim)).

Although a genuine issue remains as to whether the parties agreed to the $1,842.97 payment, the Justices' breach of contract claim may still fail as a matter of law because a settlement and compromise of a note secured by a mortgage must be in writing.  The statute of frauds provides that:

> "[n]o action shall be brought whereby to charge the defendant . . . upon a contract or sale of lands . . . or interest in or concerning them . . . unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith"

*FirstMerit Bank, N.A. v. Inks*, 7 N.E.3d 1150, 1153 (Ohio 2014) (quoting Ohio Rev. Code. § 1335.05).  The statute of frauds applies to settlement agreements, *see Douglas Co. v. Gatts*, 456 N.E.2d 841, 842 (Ohio Ct. App. 1982) ("We conclude that an oral agreement to

13

release or discharge a mortgage is within the Statute of Frauds."), and the Justices present no

evidence of an agreement, memorandum, or note that is in writing and signed by Ocwen, *see id.*

("[A]greements that do not comply with the statute of frauds are unenforceable.").  As the Ohio

Supreme Court recently held when a party tried to bring claims subject to the statute of frauds

based on an alleged, unsigned settlement agreement involving a note and mortgage:

> Here, the alleged oral agreement between Inks and FirstMerit does pertain
> to an interest in land, because it involves the terms upon which FirstMerit
> allegedly agreed to release the mortgage. As such, even if it is characterized as a
> settlement agreement, it falls within R.C. 1335.05. . . . Because there is no
> evidence that this agreement is in writing or is signed by FirstMerit, it does not
> comply with R.C. 1335.05 and is unenforceable.

*FirstMerit Bank, N.A.*, 7 N.E.3d at 1155-56 (citation omitted).

But the Court cannot find as a matter of the law that the Justices' breach of contract claim

fails under the statute of frauds because it is not clear that the $1,842.97 amount represented a

settlement amount.  The record is unclear as to whether that amount represented payment in full

under the terms of the Second Loan (in which case the statute of frauds would not apply) or

whether it was a compromise for a reduced amount (in which case the statute of frauds would

apply).  According to the Justices, they received a letter from Ocwen's counsel in August 2011

(the same month that they sent the check) representing the outstanding amount on the Second

Loan as $1,827.97.  (Nancy Justice Aff. ¶ 24.)  Ocwen maintains that the amount owed at the

time was approaching $3,000.  (Lucas Aff. ¶ 53.)  Because the Court is unable to determine

whether the $1,842.97 was a compromise for a lesser amount than that due under the terms

Second Loan, the Court will deny summary judgment on this claim.

Nevertheless, the Court dispenses with the Justices' argument that the doctrine of part

performance makes the statute of frauds inapplicable.  The Justices rely on cases that state oral

agreements may be enforceable in cases involving the sale of property.  But "this exception has

14

been narrowly cast," *Alford v. Moore*, No. CA98-04-026, 1998 WL 820920, at *4 (Ohio Ct. App. Nov. 30, 1998), and "[t]he doctrine of part performance can be invoked, to take a case out of the statute of frauds in Ohio only in cases involving the sale or leasing of real estate, wherein there has been a delivery of possession of the real estate in question . . . ." *Spectrum Benefit Options, Inc. v. Med. Mut. of Ohio*, 880 N.E.2d 926, 938 (Ohio Ct. App. 2007). The purported agreement in this case did not involve the sale or transfer of real estate but rather the delivery of funds for the release of the Second Loan. *See id.* (finding doctrine inapplicable where "the subject matter of the alleged contract did not involve the sale or leasing of realty"). And, the purported agreement did not involve the delivery of real estate. *See Alford*, 1998 WL 820920, at *4 ("Partial performance must be premised, at a minimum, on the buyer taking possession of the property."). Thus, the Court will find the part-performance doctrine inapplicable if the amount sent by the Justices represented a compromise of the amount owed under the note.

Last, the Court dispenses with the Justices' argument that promissory estoppel would take the purported settlement agreement out of the statute of frauds. "Courts generally apply the promissory-estoppel exception to the statute of frauds defense only in narrow circumstances." *Spectrum Benefit Options, Inc*, 880 N.E.2d at 937 (internal quotation marks omitted). First, the exception generally applies only if the party asserting it pleaded it as a separate cause of action. *Id.* (citation omitted). The Justices have not done so here. Second, "there must be either a misrepresentation that the statute of fraud's requirements have been complied with or a promise to make a memorandum of the agreement." *Id.* (internal quotation marks omitted). The Justices point to no evidence showing that Ocwen misrepresented its compliance with the statute of frauds or that it promised to make a memorandum of the parties' alleged agreement. Therefore, the exception would not apply here. *See id.*

15

In sum, the Court finds a genuine issue as to whether the $1,842.97 sent by the Justices was a compromise of the amount owed or whether it was the amount due under the terms of the loan at that time.   Therefore, the Court will deny summary judgment to both parties on this claim.

### 3. Other Breach of Contract Claims Regarding the Second Loan

Ocwen and HSBC also addressed the Justices' allegations in their Amended Complaint that the loan servicer incorrectly applied payments resulting in improper charges and fees. Ocwen explained in its summary judgment briefing how the Justices had a simple interest loan that caused interest to accrue daily and that payments apply first to interest before paying down principal.  Thus, the timing, amount, and frequency of payments affect how quickly the balance is repaid.  (*See* Second Note ¶ 3; Ltr; ECF No. 34-6; Ltr. A.G.; ECF No. 34-10.)  The Justices do not do not provide any explanation or evidence showing that their payments were misapplied or inappropriate fees were charged under the Second Note for the time period before Ron Justice's purported agreement with Ocwen in August 2011. Therefore, the Court finds judgment appropriate to Ocwen and HSBC on these allegations insofar as they relate to conduct before Ron Justice purportedly reaching an agreement with Ocwen in August 2011.  *See Douglas v. Cnty. of Jackson*, 804 F. Supp. 944, 948 (E.D. Mich. 1992) ("The moving party need not produce evidence showing the absence of a genuine issue of material fact; rather, 'the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.'") (quoting *Celotex Corp.*, 477 U.S. at 325).

The Justices also alleged in their Amended Complaint that Ocwen and HSBC breached several settlement agreements other than Ron Justice's August 2011 agreement.  The defendants

moved for summary judgment on these charges, offering evidence that no contracts were ever formed in these instances. Specifically, the evidence shows that Ocwen made three separate discounted payoff offers to the Justices in October, November, and December 2010. (Lucas Aff. ¶¶ 45-50.) None of these offers were accepted according to the terms of the offer. (*See id.*) In September 2011, Ocwen made another payoff quote, this time in the amount of $2,942.05, but the Justices never tendered the payoff funds. (*Id.* ¶¶ 54-55.) In April 2012, Ocwen sent another payoff quote, and again it is undisputed that the Justices did not tender this amount. (Ltr.; ECF No. 34-21; Lucas Aff. ¶¶ 57-58.) The Justices offer no evidence to contest Ocwen's account of these payoff offers. Though the Justices maintain that Ocwen refused to accept a *check* that they mailed to satisfy the November 2010 payoff, Ocwen refused to accept it, as the offer required the funds be *wire transferred*. The Justices offer no evidence to rebut that this was a condition of the offer. (Nancy Aff. ¶¶ 22-23; Lucas Aff. ¶ 47.) *See Bernabei v. St. Paul Fire & Marine Ins. Co.*, 2005 WL 351754, at *3 (Ohio Ct. App. 2005) ("[I]t should be noted that the offeror is the master of his offer and may require acceptance in precise conformity with his or her offer before a contract is formed."). Therefore, the Court finds that Ocwen and HSBC are entitled to judgment for any purported breach arising from these payoff offers.

**B. Fair Debt Collection Practices Act ("FDCPA")**

Next, the Justices argue that Ocwen violated the FDCPA.[5] To succeed, the Justices must show that "1) they are 'consumers' under the FDCPA; 2) the debt arose out of a transaction entered into for personal, family, or household purposes; 3) the defendant is a 'debt collector' as defined by the FDCPA; and 4) the defendant violated a provision of the FDCPA." *Bridge v. Ocwen Fed. Bank*, No. 1:07 CV 2739, 2014 WL 2442183, at *5 (N.D. Ohio May 30, 2014).

---

[5] The Court previously dismissed this claim against HSBC in its Opinion and Order on February 7, 2014. (*See* Opn. & Order at 15; ECF No. 24.)

Ocwen seeks to avoid liability by denying that it is a "debt collector."  The Justices maintain that it is a "debt collector" and that it violated § 1692e by using false, deceptive, or misleading statements in collecting debt and § 1692f by using unfair or unconscionable means to collect a debt.  The Court considers each of these arguments in turn.

**1. Debt Collector**

Ocwen argues that it does not qualify as a "debt collector" and thus falls outside of the ambit of the FDCPA.  *See* 15 U.S.C. § 1692(e); *id.* § 1692k.  Under the statute, "debt collector" means "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6).  Ocwen asserts that its principal business is servicing loans, and argues that it falls under the FDCPA's exception to the definition of debt collector by highlighting that the statute "does not include . . . any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . concerns a debt which was not in default at the time it was obtained by such person." 15 U.S.C. § 1692a(6)(F).  Ocwen argues that the First and Second Loan were not in "default" at the time it obtained the servicing rights.

The Court disagrees.  Though the FDCPA does not define "default," *Martin v. Select Portfolio Serving Holding Corp.*, No. 1:05-CV-273, 2008 WL 618788, at *5 (S.D. Ohio Mar. 3, 2008), the record shows that the FDCPA applies to Ocwen here.  The evidence shows that when Ocwen obtained the servicing rights in mid-November 2004, both loans were overdue for their September, October, and November 2004 payments.  (Lucas Aff. ¶¶ 12-13, 37-38.)  While there is a distinction between a note that is in default and one that is outstanding, *see Jones v. Intuition,*

*Inc.*, 12 F. Supp. 2d 775, 779 (W.D. Tenn. 1998), the Justices were over two months behind in payments.  And each note states that the Justices "*will be in default* under this Note if[] [they] fail to make any payment or pay other amount owing under this Note when due."  (First Note ¶ 12; ECF No. 34-3; Second Note ¶ 12; ECF No. 36-5 (emphasis added).)  *See Bridge v. Ocwen Federal Bank, FSB*, 681 F.3d 355, 362 (6th Cir. 2012) (holding that the FDCPA applies to "any non-originating debt holder that either acquired a debt in default," or to any non-originating debt holder that "treated the debt as if it were in default at the time of acquisition"); *see also Alibrandi v. Financial Outsourcing Servs., Inc.*, 333 F.3d 82, 87 n.5 (2d Cir. 2003) (advocating that the issue of default be left up to the contractual agreement of the parties).  Thus, the Court concludes that Ocwen qualifies as a debt collector under the statute.

### 2. First Loan

The Justices assert that Ocwen violated 15 U.S.C. § 1692e(2)(A) by misrepresenting their monthly amount due on the First Loan after their interest rate increased under the Loan Modification.  That section prohibits the "false representation of the character, amount or legal status of any debt."  The Justices point to a February 2013 letter written by Ocwen returning that month's payment that stated "[t]hese funds are being returned, as they are not sufficient to satisfy the defaulted amount of your loan."  (Letter; ECF No. 36-13.)[6]  In determining whether a statement qualifies as misleading, the Court employs an objective, "least-sophisticated-consumer" test.  *Miller v. Javitch, Block & Rathbone*, 561 F.3d 588, 592 (6th Cir. 2009).  That is, "[w]hether a debt collector's actions are false, deceptive, or misleading under [the FDCPA] is

---

[6] Ocwen states that this Exhibit is not authenticated.  But both Nancy and Ronald Justice, in their separate affidavits, attested that this letter "is a true and accurate copy of the February 20, 2013 letter [they] received from Ocwen."  (Nancy Aff. ¶ 12; ECF No. 36-1; Ronald Aff. ¶ 12; ECF No. 36-2.)  *See* Fed. R. Evid. 901(b)(1) (listing "[t]estimony that an item is what it is claimed to be" suffices to authenticate an item of evidence).

based on whether the 'least sophisticated consumer' would be misled by defendant's actions." *Wallace v. Wash. Mut. Bank, F.A.*, 683 F.3d 323, 326 (6th Cir. 2006).

Both parties rely on their arguments regarding the alleged breach of the Loan Modification.  According to the Justices, they made all the payments as required under the Loan Modification because the increased interest rate did not increase the amount they owed on a monthly basis.  (Justices Aff. ¶¶ 6-7, 11.)  Ocwen maintains that it made no materially false misrepresentation because the Justices did not make complete monthly payments under the Loan Modification after the increased interest rate raised the monthly amount due.  (Reply at 11; ECF No. 39.)

The Court concludes that Ocwen violated the FDCPA.  As discussed above, the Loan Modification did not increase the Justices' monthly payments.  (*See supra* Section III.A.1.)  Thus, Ocwen's February 2013 letter misrepresented the character and amount of the Justices' debt.

The Justices also allege in their motion that Ocwen violated the FDCPA by charging improper assessments on the First Loan that were not authorized by the loan documents or permitted by law.  Title 15 U.S.C. § 1692f prohibits "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law."

Again, the Court finds a violation because the Loan Modification did not increase the Justices' monthly amount due.  But, Ocwen assessed interest and late charges on the account after July 2011, which the Note did not permit it to do because the Justices were making full payments.  (Lucas Aff. ¶ 22 (stating the First Loan accrued interest and late charges after July 2011)); *see also* (Nancy Aff. ¶¶ 6-7, 11 (stating that the Justices continued to make payments at

the reduced amount under the Loan Modification); *see also* Transaction History; ECF No. 34-5.)[7]

Ocwen also moved for summary judgment on the Justices' allegation that the First Loan was falsely reported to credit agencies as delinquent. The Justices do not mention this allegation in their summary judgment briefing. The Court will deny summary judgment to Ocwen on this allegation because the defendants assume their interpretation of the Loan Modification is correct. But, in fact, it is not, and thus the evidence shows that the Justices were not delinquent on their payments.

**3. Second Loan**

Next, the Justices assert that the payoff quotes Ocwen sent them after the August 2011 payment was returned constituted a violation of the FDCPA.[8] Any obligation under the Second Loan, according to the Justices, was satisfied when they tendered the $1,842.97 payment, but Ocwen continued to send payoff demands of differing amounts. Ocwen maintains that it never offered the $1,842.97 payoff amount and thus the Justices' check was not sufficient to satisfy the loan and thus the payoff quotes that it subsequently sent the Justices were not false or misleading.

The Court concludes that a genuine issue of material fact exists as to whether Ocwen's actions violated the FDCPA. If Ocwen in fact told Ron that $1,842.97 would satisfy the loan, then the Justices may be able to show that Ocwen used a false or misleading method to collect a higher payoff amount. But if Ocwen did not make this statement to the Justices' son, then it may

---

[7] The Court notes that late charges are permissible under the Note. (Note ¶ 3; ECF No. 34-3.) In establishing damages at trial, the Justices will need to tie the improper charges to Ocwen improperly raising the monthly amount due.

[8] The Justices do not specify which section of the FDCPA Ocwen's actions allegedly violated. The Court construes their argument, which cites Ocwen "repeatedly misrepresent[ing]" and "false[ly] represent[ing] the amount to pay off the Second Loan, to be a violation of 15 U.S.C. § 1692e and § 1692f.

be able to show that its subsequent payoff quotes were not misleading or fraudulent.  (*See supra* Section III.A.2 (explaining that a genuine issue remains as to whether a settlement agreement was reached).)  Therefore, both parties' summary judgment motions as to this claim are denied.

The Court grants summary judgment to Ocwen, however, regarding any alleged FDCPA violation from payoff quotes sent before the alleged settlement agreement.   Ocwen explains how these were discounted payoff offers to accept a reduced amount in full satisfaction of the Second Loan.  The Justices do not provide any explanation or evidence as to how this correspondence reflected a misrepresentation of the amount due.

Ocwen also moved for summary judgment as to the Justices' allegations that they falsely reported the Second Loan to credit reporting agencies as delinquent.  Because the Court cannot conclude as a matter of law whether the parties reached a settlement agreement, the Court also cannot conclude whether Ocwen falsely reported the Second Loan to credit reporting agencies as delinquent after the alleged settlement agreement.  But because the Justices offer no evidence of improper reporting before the alleged settlement, the Court grants summary judgment to Ocwen for any claim arising out of its reporting that predates its telephone conversation with the Justices' son.

Last, Ocwen moved for summary judgment as to any allegation that it improperly applied the Justices' payments on this loan, arguing that while the Justices' unpaid principal balance decreased as they made payments, late charges and accrued interest affected the rate at which the principal decreased.  (*See* ECF Nos. 34-6; 34-16; 34-18.)  The Justices, outside of their argument that their son reached an agreement with Ocwen over the phone to satisfy the loan for $1,842.97, do not defend this claim on summary judgment by offering an explanation or evidence showing how Ocwen improperly applied payments.  Again, the Court finds Ocwen entitled to summary

judgment on these allegations that stem from actions predating the alleged settlement agreement with the Justices' son. The Justices' claim involving improper application of payments survives to the extent that it involves Ocwen's conduct during and after the alleged settlement agreement with the Justices' son.

### 4. Emotional Damages

Ocwen moved for summary judgment to the Justices' claim for emotional damages in the FDCPA claim. "While damages for emotional distress are collectable under the FDCPA, . . . a plaintiff must show more than transitory symptoms of emotional distress." *Miller v. Prompt Recovery Servs., Inc.*, No. 5:11CV2292, 2013 WL 3200659, at *13 (N.D. Ohio June 24, 2013) (internal quotation marks omitted). A "plaintiff must explain the circumstances of h[er] injury in reasonable detail, and must not rely on conclusory statements unless the facts underlying the case are so inherently degrading that it would be reasonable to infer that a person would suffer emotional distress from the defendant's action." *Id.* (internal quotation marks omitted). The Justices do not address emotional damages in their summary judgment briefing and thus fail to establish any actual damage as a result of emotional stress from the alleged FDCPA violations. As such, the Justices' claims for emotional damages under the FDCPA fail as a matter of law.

### C. Truth in Lending Act ("TILA")

The Justices' next series of claims stem from alleged violations of the Truth in Lending Act ("TILA").[9] TILA has several purposes: "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him

---

[9] This Court previously dismissed the TILA claims against Ocwen in its Opinion and Order of February 7, 2014. (Opn. & Order at 17; ECF No. 24.) These claims thus proceed under a vicarious liability theory against HSBC. *See Kolano v. Bank of Am., NA*, No. 5:13-CV-00832, 2014 WL 1117862, at *6 (N.D. Ohio Mar. 19, 2014) ("A mortgage owner may be held vicariously liable for a servicer's failure to comply with 15 U.S.C. § 1641(f).").

and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 (1998) (quoting 15 U.S.C. § 1601(a)). The statute thus requires creditors to "provide borrowers with clear and accurate disclosures of terms dealing with things like finance charges, annual percentage rates of interest, and the borrower's rights." *Id.* Given its purpose, the Sixth Circuit has "repeatedly stated that TILA is a remedial statute and, therefore, should be given a broad, liberal construction in favor of the consumer." *Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 163 F.3d 948, 950 (6th Cir. 1998). "Even technical or minor violations of the Act impose liability on the lender." *Weeden v. Auto Workers Credit Union, Inc.*, 173 F.3d 857, 1999 WL 191430, at *4 (6th Cir. 1999) (table) (per curiam). By its terms, TILA provides an action for damages against "any creditor who fails to comply with any requirement imposed under" its parts. 15 U.S.C. § 1640(a). The Justices base their TILA claims on two sections: 15 U.S.C. § 1641(f)(2) and 15 U.S.C. § 1639g.

### 1. First Loan

The Justices argue that that Ocwen failed to provide an appropriate response to their December 2012 inquiry for information under 15 U.S.C. § 1641(f)(2). That section provides: "Upon written request by the obligor, the servicer shall provide the obligor, to the best knowledge of the servicer, with the name, address, and telephone number of the owner of the obligation or the master servicer of the obligation." The Justices' December 12, 2012 letter asked for the name and contact information of the owner of the note, and for the name of the master servicer of the note. (Ltr.; ECF No. 36-11.)

Ocwen responded to this letter, identifying for the Justices that "[t]he loan is one of many in a securitized investment trust: ACE Securities Corp. Home Equity Loan Trust, Series 2005-

SN1, Asset Backed Pass-Through Certificates." (Letter at 2; ECF No. 34-12; Lucas Aff. ¶ 29.)

Thus, Ocwen's response identified the owner of the note. *See Jaldin v. ReconTrust Co.*, 539 F.

App'x 97, 103 (4th Cir. 2013) (concluding that where a loan was placed in a trust, the trust was

the owner of the debt); *see also O'Dell v. Deutsche Bank Nat. Trust Co.*, No. 1:12–cv–985, 2013

WL 2389874, at *12 (E.D.Va. May 30, 2013) (same). But the Justices also inquired about the

"address[] and telephone number of the owner of the note" and Ocwen did not provide this

information. Therefore, the Court finds a violation of TILA as to the First Loan.

Ocwen highlights that it identified itself as the servicer and provided its phone number

and address and argues that this should satisfy its TILA obligations because the statute requires

providing information regarding *either* "the owner . . . *or* the master servicer of the obligation."

(Reply at 16; ECF No. 39 (quoting 15 U.S.C. § 1641(f)(2) (emphasis added)).)[10] But this Court

has already rejected this argument. (*See* Opn. & Order at 18; ECF No. 24.) Reading the statute

in context, the servicer must provide the information "[u]pon written request by the obligor." In

other words, the servicer must do so based on the nature of the obligor's request—not based on

whatever piece of information the servicer itself wants to send. Reading the statute this way is

consistent with purpose of the statute—TILA is a remedial statute that is to be construed broadly

---

[10] For the sake of argument, the Court assumes that Ocwen adequately identified itself. The Justices point out that while Ocwen identified itself as "the servicer" in its response, it did not identify itself as the "master servicer." Courts have recognized that "[t]here may be situations where the servicer may not have to use the 'Magic Words' 'master servicer' to satisfy the statute." *Gallowitz v. Fed. Home Loan Mortgage Corp.*, 944 F. Supp. 2d 1265, 1266-67 (S.D. Fla. 2013) (citations omitted); *see also St. Breux v. U.S. Bank, Nat. Ass'n*, 919 F. Supp. 2d 1371, 1377 (S.D. Fla. 2013 ("[T]he Court finds that Litton was not obligated to use the magic word 'master servicer'."). But "a homeowner should not have to guess whether the responding servicer is only one of the servicers or whether it is the master servicer." *Gallowtiz*, 944 F. Supp. 2d at 1266-67; *cf. Kissinger v. Wells Fargo Bank, N.A.*, No. 12-60878-CIV, 2013 WL 360027, at *4 (S.D. Fla. Jan. 30, 2013) (concluding as a matter of law that letter identified servicer as the "master servicer" where letter explained that company was "the mortgage servicer on [plaintiff's] mortgage loan and collects payments on behalf of the owner"). The parties do not adequately address this issue. The Justices simply highlight that Ocwen did not use "magic words," and the defendants do not address it in their briefing.

in the consumer's favor. *Begala*, 163 F.3d at 950.  In accordance with the statute, the Justices asked for information concerning the owner of the First Loan; and evidence shows that Ocwen failed to send that information.

In sum, the Court grants summary judgment to the Justices on their TILA claim regarding the First Loan.[11]  The Justices moved only for summary judgment as to liability, however, and so damages will be addressed at trial.  (See Mot. at 1-2; ECF No. 36.)

**2. Second Loan**

The Justices sent another inquiry to Ocwen on November 20, 2012, similarly asking about the owner and master servicer of the Second Loan.  (Ltr.; ECF No. 36-25.)  Ocwen never responded.  The Justices argue that there is no genuine issue of material fact that Ocwen violated 15 U.S.C. § 1641(f)(2).

The Court agrees.  The Justices put forth evidence that they sent the letter in November 2012.  The inquiry was sent by certified mail and signed upon delivery by the same Ocwen agent who signed as receiving the letter regarding the First Loan.  (Certified Mail Receipt; ECF No. 36-25.)  Notably, Ocwen does not present any evidence denying that it ever received this letter.  Rather, it states that "Ocwen has no record in its loan file of receiving Plaintiffs' correspondence."  (Lucas Aff. ¶ 58.)  The Court finds this insufficient to raise a genuine dispute as to material fact.  The evidence shows that Ocwen received the letter and never responded.  Thus, the Court finds as a matter of law a violation of TILA.  The Justices moved only for summary judgment as to liability, however, and so damages will be addressed at trial.  (See Mot. at 1-2; ECF No. 36.)

---

[11] The Justices also assert that Ocwen needed to identify HSBC as trustee in its response.  The Court disagrees.  The statute imposes no such requirement and the Justices offer no authority for this position.

### 3. Whether the Justices Are "Meaningfully Deprived of Any Information"

Ocwen asserts that it is entitled to judgment even if it failed to provide the information required under TILA for the First and Second Loans. This is because the Justices were not "meaningfully deprived" of any information, according to Ocwen.

But Ocwen offers no binding authority for the position that a plaintiff cannot bring a TILA claim if it knew some of the information requested. And "[e]ven technical or minor violations of the Act impose liability on the lender." *Weeden*, 1999 WL 191430, at *4. Permitting recovery for the violations here would be consistent the Sixth Circuit's repeated admonitions "that TILA is a remedial statute and, therefore, should be given a broad, liberal construction in favor of the consumer." *Begala*, 163 F.3d at 950. "Indeed, TILA was designed to create a system of private attorney generals [sic] to aid its enforcement. *Id.* (internal quotation marks omitted).

Ocwen's only authority is *Guillaume v. Fed'l Nat. Mortg. Ass'n*, 928 F. Supp. 2d 1337 (S.D. Fla. 2013). But this case does not persuade the Court to toss aside the Justices' TILA claims. *Guillaume* dismissed a TILA claim because it concluded that recovery for the plaintiff would produce "absurd results." There, the plaintiff was engaged in a foreclosure proceeding when the alleged violation occurred, and thus the Court found that the plaintiff's request for information could not have been "legitimate" because if the plaintiffs did not know the owner or master servicer of the loan, it could have easily acquired such information through discovery in the foreclosure action or asking the opposing counsel. *Id.* at 1341-42.

But that is not what we have here. Though Ocwen previously brought a foreclosure action against the Justices, it was dismissed in September 2012, months before the Justices requested information in November and December of 2012. Nothing in the record shows that the

Justices could obtain the information through discovery or contacting the opposing counsel, as in *Guillaume*. And as Ocwen has acknowledged, "[t]he ownership of the loan may change at any time." (Ltr. A.G. at 1; ECF No. 34-10.)

Nevertheless, the Court recognizes that Ocwen had prior interactions with the Justices that may have made their requests for information somewhat redundant. For example, in its response to a letter written by the Ohio Attorney General's Office on behalf of the Justices, Ocwen identified itself as the servicer of a loan "on behalf of the registered holders of ACE Securities Corp. Home Equity Loan Trust, Series 2005-SN1, Asset Backed Pass-Through Certificates." (Ltr. A.G. at 1; ECF No. 34-10.) And the Justices may have had knowledge about their loans through other means, such as the recorded assignments of their mortgages or previous foreclosure actions. (Lucas Aff. ¶ 9; Ltr. A.G. at 2; ECF No. 34-10); Compl.; ECF No. 34-23.)

But the Court considers this information relevant to any damages that the Justices may have suffered, not whether there was a violation of TILA's mandates. Therefore, the Court declines to follow *Guillaume* in finding that the Justices' TILA claims fail as a matter of law. *See Gallowitz v. Fed. Home Loan Mortgage Corp.*, 944 F. Supp. 2d 1265, 1267 (S.D. Fla. 2013) (declining to follow *Guillaume*, noting that "the clear meaning of the statute should control"); *Galeano v. Fed. Home Loan Mortgage Corp.*, No. 12-61174-CIV, 2012 WL 3613890, at *3 n.1 (S.D. Fla. Aug. 21, 2012) (declining to consider argument that plaintiff's misused TILA because at the motion to dismiss stage because "the sole issue on a Rule 12(b)(6) motion is whether the Complaint states a claim upon which relief can be granted").

**4. Payoff Request**

HSBC moves for summary judgment on the Justices' claim that HSBC violated § 1639g by failing to provide a payoff quote within seven days of its receipt of the request allegedly sent

in November 2012.  As HSBC notes, this law was not in effect at the time of the relevant conduct.  The Justices did not address this claim in its motion for summary judgment.

The Court finds that HSBC is entitled to judgment as a matter of law on this claim.  "As the relevant events in this case took place in 201[2], 15 U.S.C. § 1639g cannot validly form the basis of a cause of action in this case."  *See Hittle v. Residential Funding Corp.*, No. 2:13-CV-353, 2014 WL 3845802, at *3 (S.D. Ohio Aug. 5, 2014).

### D. Real Estate Settlement Procedures Act ("RESPA")

The last set of claims that the Justices present allege that Ocwen failed to timely and properly respond to Qualified Written Requests ("QWR") they sent inquiring about the First and Second Loans in violation of 12 U.S.C. § 2605.[12]  Congress enacted RESPA "in part to provide more effective advance disclosure to home buyers and sellers of settlement costs, and in response to abusive practices in the real estate settlement process."  *Mellentine v. Ameriquest Mortg. Co.*, 515 F. App'x 419, 424 (6th Cir. 2013) (internal quotation marks omitted).  According to the statute, a consumer can send a loan servicer a QWR, which triggers several servicer duties, including providing a written response acknowledging receipt of the QWR within five days, *see id.* § 2605(e)(1)(A); and, within thirty days, providing an answer, *see id.* § 2605(e)(2).  The QWR must relate to the servicing of the loan.  *See* 12 U.S.C. § 2605(e)(1)(A); *see also Medrano v. Flagstar Bank, FSB*, 704 F.3d 661, 666 (9th Cir. 2012) (noting that § 2605(e)'s requirement that a QWR "must request information relating to servicing . . . ensures that the statutory duty to respond does not arise with respect to *all* inquiries or complaints from borrowers to servicers").

---

[12] To the extent that the Justices seek to hold HSBC liable for Ocwen's alleged violations, the Court finds that these defendants are entitled to summary judgment as § 2605(e) imposes duties on "loan servicers."  *See Medrano v. Flagstar Bank, FSB*, 704 F.3d 661, 667 (9th Cir. 2012) ("[O]nly servicers of loans are subject to § 2605(e)'s duty to respond.");  *see also Joyner v. MERS*, 451 F. App'x 505, 507 (6th Cir. 2011) (per curiam).  The defendants highlighted this in their motion for summary judgment and the Justices did not address this in response.  Thus, these claims continue against only Ocwen.

### 1. First Loan

Ocwen received a correspondence from the Justices on or about December 27, 2012 labeled "RESPA DEMAND" that requested information regarding the servicing of the First Loan.  (QWR; ECF No. 34-11; Lucas Aff. ¶ 29.)  Ocwen responded within the statutorily required time period and provided information responsive to the Justices' request such as when Ocwen began servicing the First Loan, the current interest rate, and the transaction history.  (QWR Resp.; ECF 34-12.)  The Justices do not identify any "information relating to the servicing" of the loan that Ocwen did not address in its reply letter.[13]  Therefore, the Court finds no genuine issue that Ocwen appropriately responded to the Justices' QWR regarding the First Loan and thus no RESPA violation occurred.  *See Pinchot v. Bank of Am., N.A.*, No. 12-CV-12994, 2012 WL 6591517, at *11 (E.D. Mich. Dec. 18, 2012) ("While Plaintiffs may believe Defendant should have provided more information, Defendant was only required to respond to requests for 'information relating to the servicing of [Plaintiff's] loan.'") (quoting 12 U.S.C. § 2605(e)(1)(A)); *see also Yetiv v. Chase Home Fin. LLC*, No. 4:11-CV-01250, 2012 WL 112597, at *6 (S.D. Tex. Jan. 11, 2012) ("To the extent the letter is non-responsive, it only declines to address questions from Yetiv that were not related to the servicing of the loan.").

### 2. Second Loan

As with the TILA claims, Ocwen attempts to excuse its failure to respond to the Justices' QWR regarding the Second Loan by arguing that the Justices were not "meaningfully deprived of information."  According to Ocwen, the Justices already knew the information asked for in the QWR, and thus this is "another clear attempt to obtain statutory damages and a fee award and to leverage settlement."  (Reply at 20; ECF No. 39.)

---

[13] Indeed, the Justices make no reference to this loan in their briefing other than to say that there is no genuine issue of material fact that its letter to Ocwen qualified as a QWR.  Ocwen does not dispute this; rather, it asserts that it sufficiently responded.

Again, however, Ocwen offers no binding authority for its position that the Justices cannot bring a RESPA claim because they may have known the information requested in their RESPA demand.  It points to two out-of-circuit decisions that rejected a RESPA claim, but in those instances, the plaintiff sent an identical QWR after receiving an adequate response to an initial inquiry.  *See Bates v. JPMorgan Chase Bank, NA*, 768 F.3d 1126, 1135 (11th Cir. 2014) ("To the extent Bates contends she raised a new question, warranting a new response, in her second request, this claim fails both because the prior response was adequate and because again there were no damages as a matter of law stemming from an inadequate response."); *Hawkins-El v. First Am. Funding, LLC*, 891 F. Supp. 2d 402, 409 (E.D.N.Y. 2012) *aff'd*, 529 F. App'x 45 (2d Cir. 2013) ("To the extent Plaintiff claims that FAF violated the statute because it did not respond to every subsequent letter sent by FAF, these letters raised essentially the same dispute described in his initial letter. FAF's initial response adequately addressed Plaintiff's concerns pursuant to RESPA.").

These decisions do not apply here.  The record contains no evidence that the Justices knew all of the information that they asked for in their QWR.  In their QWR, the Justices asked for a "statement of the amount necessary to reinstate this loan." (Nov. QWR; ECF No. 36-25.) Ocwen nowhere points to evidence showing that the Justices knew this amount in November 2012 when they sent their QWR.  And, it is reasonable to assume that this amount changed since the last time Ocwen conveyed this information to them.  After all, Ocwen continually increased the Justices' payoff amount from October 2010 through April 2012.  *See Rak v. Saxon Mortgage Servs., Inc.*, No. CIV.A. 12-13801, 2014 WL 861485, at *7 (E.D. Mich. Jan. 9, 2014) *report and recommendation adopted in part, rejected in part on other grounds*, No. 12-13801, 2014 WL

859849 (E.D. Mich. Mar. 5, 2014) (distinguishing *Hawkins-El* where borrower did not send identical correspondence).

Moreover, RESPA imposes a duty on the servicer to respond to a QWR. *See* 12 U.S.C. § 2605(e)(2) (stating that "the servicer *shall*" take action with respect to an inquiry) (emphasis added). The cases cited by Ocwen do not hold that plaintiffs are barred from bringing a RESPA claim when they had knowledge at one point of the information requested in the QWR. Rather, in those cases, the defendants fulfilled their RESPA duty by responding to an initial QWR. Here, it is uncontroverted that the Justices sent a QWR in November 2012 and Ocwen never responded. (Certified Mail Receipt; ECF No. 36-25.) Thus, Ocwen never fulfilled its obligation under RESPA. *Cf. Hawkins-El*, 891 F. Supp. 2d at 409 ("FAF's initial response adequately addressed Plaintiff's concerns *pursuant to RESPA*.") (emphasis added).

The purposes underlying RESPA "are very similar to those of the Truth in Lending Act," and "[a]s a remedial statute, RESPA is construed broadly to effectuate its purposes." *Marais v. Chase Home Fin. LLC*, 736 F.3d 711, 719 (6th Cir. 2013) (citations omitted). Thus, the Court considers these concerns to be more appropriately addressed with respect to any damages suffered by the Justices, and not to Ocwen's compliance with RESPA. The Court concludes that Ocwen still had a duty under RESPA to respond to the Justices November QWR. *Cf. Galeano*, 2012 WL 3613890, at *3 n.1 (declining to consider argument that plaintiff misused TILA because at the motion to dismiss stage because "the sole issue on a Rule 12(b)(6) motion is whether the Complaint states a claim upon which relief can be granted").

### 3. Damages

Recovery under RESPA requires more than establishing a violation. The Plaintiff must suffer actual, demonstrable damages, and the damages must occur "as a result of" the specific

violation. *Jester v. CitiMortgage*, No. 1:13 CV 1926, 2014 WL 5091712, at *4 (N.D. Ohio Oct. 9, 2014) (citing 12 U.S.C. § 2605(f)(1)(A)). "Damages are a necessary element of a RESPA claim." *Id.* An individual prevailing on a RESPA claim is entitled to:

> (A) any actual damages to the borrower as a result of the failure; and

> (B) any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $1,000.

> 12 U.S.C. § 2605(f)(1)(A) & (B)

As Ocwen correctly notes, the Justices do not point to any evidence showing that Ocwen engaged in a "pattern or practice of noncompliance." Rather, the Justices maintain that "the cost of preparing the QWR letters is enough to show actual damages," and point to evidence that the cost of preparing the November QWR totaled $117. (Gerling Aff. ¶ 8; ECF No. 36-17.) (Resp. at 33; ECF No. 36.) Ocwen asserts that there is no causal connection between these costs and its failure to respond, and thus the $117 does not represent actual damages.

REPSA does not define the term "actual damages," *see* 12 U.S.C. § 2602 (listing definitions), and so the Court applies the common meaning: "[a]n amount awarded to a complainant to compensate for a proven injury or loss; damages that repay actual losses." *Marais v. Chase Home Fin., LLC*, No. 2:11-CV-314, 2014 WL 2515474, at *13 (S.D. Ohio June 4, 2014) (quoting Black's Law Dictionary (9th ed.2009)). Keeping in mind that RESPA is a remedial statute that is construed broadly to effectuate its purpose, *Marais*, 736 F.3d at 719, the Court interprets actual damages as encompassing "all expenses, costs, fees, and injuries fairly attributable to [the servicer's] failure to respond appropriately to the QWR, even if incurred before the failure to respond." *Marais*, 2014 WL 2515474, at *13; *cf. Mellentine v. Ameriquest*

*Mortgage Co.*, 515 F. App'x 419, 425 (6th Cir. 2013) (finding plaintiff's allegation of "damages in an amount not yet ascertained, to be proven at trial" sufficient to withstand motion to dismiss).

The Court finds that the cost to prepare the QWR may qualify as actual damages. True, the Justices incurred the costs of preparing the QWR on the Second Loan before Ocwen did not respond. But as the Court has previously recognized, these costs transformed from transaction costs incident to obtaining information about their loan into damages "as a result of" Ocwen's failure to respond. *See Marais*, 2014 WL 2515474, at *13; *see also McMillen v. Resurgent Capital Servs., L.P.*, No. 2:13-CV-00738, 2014 WL 3341337, at *3 (S.D. Ohio July 8, 2014) ("Therefore, where the borrower incurs costs as the result of submitting a QWR but effectively receives no benefit, due to a servicer's non-trivial violation of 12 U.S.C. § 2605(e)(2), those costs may become 'actual damages.'").

The Justices assert that they "are seeking summary judgment as to liability only at this point." (Resp. at 33; ECF No. 36.) The Court will grant the Justices summary judgment as to Ocwen's liability in failing to respond to the November 2012 QWR, and leave the damages determination for trial.

## IV. CONCLUSION

For the reasons stated above, the Justices' Motion for Summary Judgment (ECF No. 36) **IS GRANTED in PART and DENIED in PART.** Specifically, the motion is:

- **GRANTED** with respect to liability only as to the breach of contract claim on the First Loan

- **GRANTED** with respect to liability only as to the FDCPA claim on the First Loan

- **GRANTED** with respect to liability only as to the Justices' TILA claim on the First Loan and the Second Loan;

- **GRANTED** with respect to liability only as to the Justices' RESPA claim on the Second Loan; and

- **DENIED** in all other respects.

Defendants' Motion for Summary Judgment (ECF No. 34) is **GRANTED in PART and DENIED in PART.** Specifically, the motion is:

- **GRANTED** as to the Justices' breach of contract claims on the Second Loan to the extent that the claims alleged misapplication of payments and improper charges and fees before Ron Justice's purported payoff agreement with Ocwen in August 2011;

- **GRANTED** as to the Justices' breach of contract claims on the Second Loan to the extent that the claims concern alleged payoff offers other than the purported agreement between Ron Justice and Ocwen in August 2011;

- **GRANTED** as to the Justices' FDCPA claims involving the Second Loan concerning false payoff quotes, false reporting to credit reporting agencies, and improper application of payments to the extent that these allegations stem from conduct that predates the purported August 2011 agreement between Ron Justice son and Ocwen;

- **GRANTED** as to any claim for emotional damages under the FDCPA;

- **GRANTED** as to the Justices' TILA claim regarding the alleged violation of 1639g;

- **GRANTED** as to the Justices' RESPA claim regarding the First Loan; and

- **DENIED** in all other respects.

**IT IS SO ORDERED.**

_____
1-16-2015
**DATE**

_____
**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**